06-3340-cv
NetJets Aviation, Inc. v. LHC Communications, LLC


UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: January 15, 2008          Decided: August 8, 2008)


Docket No. 06-3340-cv

_____

NETJETS AVIATION, INC., and NETJETS SALES, INC.,

Plaintiffs-Appellants,

- v. -

LHC COMMUNICATIONS, LLC, and LAURENCE S. ZIMMERMAN,

Defendants-Appellees.

_____

Before:  KEARSE, LEVAL, and CABRANES, Circuit Judges.

Appeal from so much of a judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, as (a) dismissed claims against defendant company for breach of contract, and (b) dismissed claims against the individual defendant, on a veil-piercing theory of liability, for breach of contract and account stated.

Vacated and remanded.

ROBERT T. BARNARD, New York, New York (Joseph B. Koczko, Courtney L. Scheinmel, Thompson Hine, New York, New York, O. Judson Scheaf, Scott A. Campbell, Michele L. Noble, Thompson Hine, Columbus, Ohio, on the brief), for Plaintiffs-Appellants.

MICHAEL F. SCHWARTZ, New York, New York (Penn Proefriedt Schwarzfeld & Schwartz, New York, New York, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

Plaintiffs NetJets Aviation, Inc., and NetJets Sales, Inc. (collectively "NetJets"), appeal from so much of a judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, as summarily dismissed their claims against defendant LHC Communications, LLC ("LHC"), for breach of contract and their claims against defendant Laurence S. Zimmerman, as LHC's alter ego, for breach of contract and account stated. The district court, having granted partial summary judgment in favor of NetJets on account-stated claims against LHC, sua sponte dismissed NetJets's breach-of-contract claims against LHC on the ground that they were duplicative of the account-stated claims. The court sua sponte granted summary judgment dismissing NetJets's claims against Zimmerman on the ground that NetJets had not adduced sufficient evidence to pierce the corporate veil. On appeal, NetJets contends principally that the district court erred (1) in treating its breach-of-contract claims as duplicative of its-account-stated claims, because the pertinent contracts allow NetJets to recover not only the balances due on LHC's accounts but also attorneys' fees, and (2) in concluding that there was not sufficient evidence to support its breach-of-contract and account-stated claims against Zimmerman as LHC's alter ego. Finding merit in NetJets's

-2-

contentions, we vacate so much of the judgment as dismissed the above claims and remand for further proceedings.

## I. BACKGROUND

NetJets is engaged in the business of leasing fractional interests in airplanes and providing related air-travel services. LHC is a Delaware limited liability company whose sole member-owner is Zimmerman. Most of the facts with respect to the relationship between NetJets and LHC are not in dispute.

### A. The Contracts Between NetJets and LHC

On August 1, 1999, LHC entered into two contracts with NetJets. In the first (the "Lease Agreement"), NetJets leased to LHC a 12.5 percent interest in an airplane, for which LHC was to pay NetJets a fixed monthly rental fee. The lease term was five years, with LHC having a qualified right of early termination. The second contract (the "Management Agreement") required NetJets to manage LHC's interest in the leased airplane and to provide services such as maintenance and piloting with respect to that airplane, or substitute aircraft, at specified hourly rates. It required LHC to pay a monthly management fee, as well as fuel charges, taxes, and other fees associated with LHC's air travel. The Management Agreement allotted to LHC use of the airplane for an average of 100 hours per year for the five-year term of the lease ("LHC air hours"), and it provided that if the leased airplane were

unavailable at a time when LHC wished to use it, NetJets would provide substitute aircraft. NetJets regularly sent LHC invoices for the services provided under the Lease and Management Agreements.

The Lease Agreement provided that "[i]f any action at law or in equity is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief to which such party may be entitled." (Lease Agreement § 19.) It was agreed that the Lease Agreement would be "governed by and construed in all respects in accordance with the laws of the State of New York." (Id. § 17.) The Management Agreement, which the parties agreed would be governed by Ohio law (see Management Agreement § 21), provided that if LHC failed to pay amounts due under that Agreement, LHC would be liable for the costs of collection, including reasonable attorneys' fees (see id. § 7).

In July 2000, LHC terminated its agreements with NetJets. LHC's chief financial officer ("CFO") James P. Whittier sent a letter, addressed to a NetJets vice president, stating, in pertinent part, that "[t]he present outstanding is $440,840.39 and we are requesting that you apply the deposit of $100,000 against the outstanding and contact this office to resolve the balance." (Letter from James P. Whittier to Ron Miller dated July 24, 2000 ("LHC Termination Letter").)

As requested, NetJets contacted LHC and applied the $100,000 deposit against LHC's debt; however, it did not receive payment of the remaining balance of $340,840.39. In 2001, LHC

ceased operations.

B.   The Present Action and the Decision of the District Court

NetJets commenced the present diversity action in 2002, asserting claims against LHC and Zimmerman for breach of contract, account stated, and unjust enrichment.   In connection with the breach-of-contract claims, NetJets requested an award of attorneys' fees.

Following a period of discovery, NetJets moved for summary judgment against both defendants on the breach-of-contract and account-stated claims.   NetJets contended that Zimmerman should be held liable for the debts of LHC as its alter ego based on evidence, described in greater detail in Part II.B. below, of, inter alia, (a) the frequent use of LHC air hours for personal travel by Zimmerman and his friends and family, (b) the frequent transfers of funds between LHC and Zimmerman's other companies, (c) Zimmerman's frequent withdrawal of funds from LHC for his own personal use, and (d) the fact that LHC is no longer in business and has no assets with which to pay its debt to NetJets, a condition that NetJets contends was caused by Zimmerman's withdrawals.

In a Memorandum and Order dated June 12, 2006, the district court granted NetJets's summary judgment motion in part, awarding it $340,840.39 against LHC on the account-stated claims. See NetJets Aviation, Inc. v. LHC Communications LLC, No. 02 Civ. 7441, 2006 WL 1627899 (S.D.N.Y. June 12, 2006).   The court concluded that, in light of the LHC Termination Letter, whose authenticity was

unchallenged, there was no genuine issue to be tried with respect to LHC's liability to NetJets in the amount of $340,840.39. See 2006 WL 1627899, at *7. The district court denied the remainder of NetJets's motion and dismissed its contract claims against LHC--as well as its unjust enrichment claims. The court concluded that because it had ruled in favor of NetJets against LHC on the theory of account stated, NetJets's claims against LHC "for alternative relief under a breach of contract theory do not survive." Id. The court concluded that NetJets could not recover against LHC for unjust enrichment, a theory alternative to breach of contract, because NetJets's rights were grounded in contracts that were essentially undisputed. See id. at *8.

The district court also denied NetJets's motion for summary judgment on its contract and account-stated claims against Zimmerman. It stated that under Delaware law, in order to recover against Zimmerman for the debts of LHC, NetJets would be required to meet a two-pronged test showing "(1) that the business entity and its owner 'operated as a single economic entity' and (2) that [there was] an 'overall element of injustice or unfairness.'" Id. at *4 (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1458 (2d Cir. 1995), which applied Delaware law). The court concluded that although NetJets had "shown that Zimmerman and LHC functioned as a single economic unit," 2006 WL 1627899, at *5, NetJets had not "set forth any facts from which a jury could reasonably conclude that Zimmerman formed LHC with the specific fraudulent intent of evading liability to Plaintiffs," id. at *6. The court noted that while "something

- 6 -

other than specific fraudulent intent could satisfy the second prong, wherever courts have given shape to the second prong, they primarily have focused on the need to show fraud or bad faith," id.; it stated that NetJets had "not proven as a matter of law that Zimmerman conducted a sophisticated shell game to the purposeful detriment of creditors, namely NetJets," id. The district court rejected the proposition that the requisite unfairness was shown by the evidence that "Zimmerman allowed LHC to default on its payments to NetJets even as he was siphoning money from the company coffers, transferring funds to other companies he controlled, and making payments through LHC on a mortgage and luxury cars that were in his own name." Id. (internal quotation marks omitted). The court stated that "each of these actions are factors in considering the first prong of the alter ego analysis and cannot simultaneously be used by Plaintiffs to satisfy the second prong. 'To hold otherwise would render the fraud or injustice element meaningless . . . .'" Id. (quoting Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989)).

Although Zimmerman had not moved for summary judgment in his favor, the court sua sponte granted summary judgment dismissing all of NetJets's claims against him.


## II. DISCUSSION


On appeal, NetJets contends principally (1) that the district court erred in dismissing its contract claims as

duplicative of its account-stated claims, arguing that the pertinent contracts allow NetJets to recover not only the balances due on LHC's accounts but also reasonable attorneys' fees incurred in collecting those debts; and (2) that the evidence as to Zimmerman's operation of LHC for his personal use warranted the entry of summary judgment in NetJets's favor on its veil-piercing breach-of-contract and account-stated claims against Zimmerman, or at least was sufficient to preclude the entry of summary judgment dismissing those claims. Zimmerman, in addition to endorsing the district court's decision that he was entitled to judgment for lack of proof of an overall element of injustice or unfairness, contends that the entry of summary judgment in his favor may also be upheld on a different ground, see, e.g., Massachusetts Mutual Life Insurance Co. v. Ludwig, 426 U.S. 479, 480-81 (1976) (a party need not cross-appeal in order to assert an alternative ground, based on the record, to support the district court's judgment). He argues that the court was presented with sufficient evidence to preclude a finding that he and LHC operated as a single entity.

For the reasons that follow, we conclude that NetJets's breach-of-contract claims against LHC were erroneously dismissed and that NetJets is entitled to trial on its contract and account-stated claims against Zimmerman as LHC's alter ego.

A. NetJets's Breach-of-Contract Claims Against LHC

Two claims are duplicative of one another if they "arise from the same facts . . . and do not allege distinct damages."

*Sitar v. Sitar*, 50 A.D.3d 667, 670, 854 N.Y.S.2d 536, 538 (2d Dep't 2008); see, e.g., *Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994). Where a claimant is entitled to a particular category of damages on one claim but not the other, the claims are not duplicative. See generally *Freitag v. Bill Swad Datsun*, 3 Ohio App. 3d 83, 86, 443 N.E.2d 988, 992 (1981) (when a plaintiff establishes the elements of two claims arising out of the same set of facts, he is entitled to judgment on the claim that provides the greater measure of damages).

Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear. See, e.g., *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177-79 (2d Cir. 2005); *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491-92, 549 N.Y.S.2d 365, 366-67 (1989) (same). Under Ohio law, such contractual provisions for attorneys' fees are enforceable to the extent that the trial court, after consideration of all the circumstances of the case, may award such fees as are fair, just, and reasonable. See, e.g., *Nottingdale Homeowners' Association, Inc. v. Darby*, 33 Ohio St. 3d 32, 37, 514 N.E.2d 702, 706-07 (1987); *Northwoods Condominium Owners' Association v. Arnold*, 147 Ohio App. 3d 343, 348, 770 N.E.2d 627, 630-31 (2002).

On a valid cause of action for account stated, a plaintiff is entitled to recover the amount due on the defendant's account. Recovery on such a claim does not ordinarily include an award for

attorneys' fees. See, e.g., Citibank (South Dakota), N.A. v. Martin, 11 Misc. 3d 219, 225 n.6, 807 N.Y.S.2d 284, 290 n.6 (Civ. Ct. 2005) (a "fee award cannot be based upon a cause of action pleading an account stated"); see generally Keal v. Day, 164 Ohio App. 3d 21, 24, 840 N.E.2d 1139, 1141 (2005) ("Ohio has adopted the 'American Rule,' by which each party to a lawsuit must pay his or her own attorney fees," unless an exception applies, such as "the parties' contract provid[ing] for fee-shifting"). Thus, when a party has both a claim for account stated and a claim under a contract that provides for an award of attorneys' fees, the claims for breach of contract and account stated are not duplicative.

In dismissing NetJets's breach-of-contract claims as duplicative of its account-stated claims, the district court relied on Lankler Siffert & Wohl, LLP v. Rossi, No. 02 Civ. 10055, 2004 WL 541842 (S.D.N.Y. Mar. 19, 2004) ("Lankler"). That reliance was misplaced, however, because in that case the plaintiffs' claims (for account stated, breach of contract, conversion, unjust enrichment, and tortious interference with contractual relations) all "s[ought] the same relief"; thus, the Lankler court noted that "[i]f each of the judgments for the Moving Plaintiffs on their account stated claims are satisfied, then the Moving Plaintiffs will have received full relief." Id. at *4.

LHC's brief on appeal presents no serious argument in support of the district court's conclusion that the NetJets claims for account stated and breach of contract were duplicative. It merely states conclusorily that those claims "are duplicative" (LHC

- 10 -

brief on appeal at 22), and cites the fact that "NetJets' Memorandum of Law" in support of its motion for summary judgment discussed the account-stated claims "first" before discussing the breach-of-contract claims (id. at 21-22).

As set forth in Part I.A. above, both the Lease Agreement, which the parties agreed is to be governed by New York law, and the Management Agreement, which the parties agreed is to be governed by Ohio law, contain clauses that allow NetJets to recover reasonable attorneys' fees incurred in collecting the sums due under the respective Agreements. As those fees could not be recovered on claims for account stated, NetJets's contract claims were not duplicative of its claims for account stated.

B. NetJets's Claims Against Zimmerman

1. Limitations on Limited Liability

A limited liability company (or "LLC"), formed by one or more entities and/or individuals as its "members," is an entity that, as a general matter, provides "tax benefits akin to a partnership and limited liability akin to the corporate form." Elf Altochem North America, Inc. v. Jaffari, 727 A.2d 286, 287 (Del. 1999); see generally id. at 290. The shareholders of a corporation and the members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces "a difficult task," Harco National Insurance Co. v. Green Farms, Inc., No. CIV. A. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989) ("Harco").

Nonetheless, in appropriate circumstances, the distinction between the entity and its owner "may be disregarded" to require an owner to answer for the entity's debts. Pauley Petroleum Inc. v. Continental Oil Co., 239 A.2d 629, 633 (Del. 1968). In general, with respect to the limited liability of owners of a corporation,

Delaware law permits a court to pierce the corporate veil "where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner." Geyer v. Ingersoll Publications Co., 621 A.2d 784, 793 (Del. Ch. 1992); see, e.g., Martin v. D.B. Martin Co., 10 Del. Ch. 211, 217, 88 A. 612, 615 (1913) ("Martin") ("Where one corporation owns all the shares of another corporation, co-operating in the same business, the former financing the latter, and the same persons are officers of both corporations, the latter is for certain purposes to be considered as an agency, adjunct or instrumentality of the former."); id. at 216-17, 88 A. at 615 ("It must be in the power of the court to look through these legal fictions to the equitable realities and see by whom and through what agencies the wrong is done and on whom the loss ultimately falls."). Given the similar liability shields that are provided by corporations and LLCs to their respective owners, "[e]merging caselaw illustrates" that "situations that result in a piercing of the limited liability veil are similar to those [that warrant] piercing the corporate veil." J. Leet, J. Clarke, P. Nollkamper & P. Whynott, The Limited Liability Company § 11:130, at 11-7 (rev. ed. 2007); see also id. at 11-9 ("Every state that has enacted LLC piercing legislation has chosen to follow corporate law

standards and not develop a separate LLC standard.").

To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an "overall element of injustice or unfairness." Harco, 1989 WL 110537, at *4.

> "[A]n alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder."

Id. at *4 (quoting United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988) ("Golden Acres"), aff'd, 879 F.2d 857 & 860 (3d Cir. 1989)).

> "[N]o single factor c[an] justify a decision to disregard the corporate entity, but . . . some combination of them [i]s required, and . . . an overall element of injustice or unfairness must always be present, as well." Harco, [1989 WL 110537, at *5] (quoting Golden Acres, 702 F.Supp. at 1104).

Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990) ("Harper") (emphasis added), aff'd, 932 F.2d 959 (3d Cir. 1991).

As the above discussion indicates, "[n]umerous factors come into play when discussing whether separate legal entities should be regarded as alter egos," id., and "[t]he legal test for

determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over- nor under-inclusive," Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987). Stated generally, the inquiry initially focuses on whether "those in control of a corporation" did not "treat[] the corporation as a distinct entity"; and, if they did not, the court then seeks "to evaluate the specific facts with a standard of 'fraud' or 'misuse' or some other general term of reproach in mind," id., such as whether the corporation was used to engage in conduct that was "inequitable," Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 269 (D. Del. 1989) ("Mobil Oil") (internal quotation marks omitted), or "prohibited," David v. Mast, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999), or an "unfair trade practice," id., or "illegal," Martin, 10 Del. Ch. at 219, 88 A. at 615.

> Simply phrased, the standard may be restated as: "whether [the two entities] operated as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them." Mabon, Nugent & Co. [v. Texas American Energy Corp., No. CIV. A. 8578, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990)].

Harper, 743 F. Supp. at 1085. Our Court has stated this as a two-pronged test focusing on (1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness. See Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995).

Finally, we note that the plaintiff need not prove that the corporation was created with fraud or unfairness in mind. It is

sufficient to prove that it was so used. See, e.g., Martin, 10 Del. Ch. at 219, 88 A. at 615 (corporate form may be disregarded "when used as a shield for fraudulent or other illegal acts, though it does not appear that the arrangement was originally intended to perpetrate a fraud"); Sonne v. Sacks, No. CIV.A. 4416, 1979 WL 178497, at *2 (Del. Ch. June 12, 1979) (courts "look behind the corporate curtain" generally "where the facts indicate that the corporate entity has been or is being used by those in control of it to perpetrate a fraud" or to "promote injustice" (internal quotation marks omitted)).

These principles are generally applicable as well where one of the entities in question is an LLC rather than a corporation. See, e.g., Oliver v. Boston University, No. 16570, 2000 WL 1091480, at *9, *12 (Del. Ch. Jul. 18, 2000) (holding that a Massachusetts LLC, created solely to serve the interests of its owner and completely dominated by the owner, could be fairly characterized as the alter ego of its owner). In the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required. See, e.g., Delaware Limited Liability Company Act, Del. Code Ann. tit. 6, § 18-101 et seq. ("DLLCA") (requiring little more than that an LLC execute and file a proper certificate of formation, see id. § 18-201(a), maintain a registered office in Delaware, see id. § 18-104(a)(1), have a registered agent for service of process in Delaware, see id. § 18-104(a)(2), and maintain certain records such as membership lists and tax returns, see id. § 18-305(a)). On

- 15 -

the other hand, if two entities with common ownership "failed to follow legal formalities <u>when contracting with each other</u> it would be tantamount to declaring that they are indeed one in the same." <u>Trustees of Village of Arden v. Unity Construction Co.</u>, No. C.A. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000) (emphasis added).

### 2. <u>Summary Judgment Principles</u>

With the above substantive framework in mind, we turn to (a) Zimmerman's contention that he was entitled to summary judgment on the ground--contrary to the district court's opinion--that there was insufficient evidence to permit a finding that he and LHC operated as a single economic entity, and (b) NetJets's contention that the district court erred in finding that despite the intertwined operation of Zimmerman and LHC, there was insufficient evidence to permit a finding of an overall element of injustice or unfairness. In addressing these contentions, we apply the familiar principles that, in reviewing the grant--or denial--of summary judgment, <u>see</u>, <u>e.g.</u>, <u>Local Union No. 38, Sheet Metal Workers' International Association, AFL-CIO v. Pelella</u>, 350 F.3d 73, 80 (2d Cir. 2003) (denial of summary judgment is reviewable after a final decision has rendered the case appealable), we review the record <u>de novo</u>, and we view the evidence in the light most favorable to the party against which summary judgment was granted or sought, <u>see</u>, <u>e.g.</u>, <u>Amidon v. Student Association of the State University of New York at Albany</u>, 508 F.3d 94, 98 (2d Cir. 2007); <u>Cronin v. Aetna Life</u>

Insurance Co., 46 F.3d 196, 202-03 (2d Cir. 1995); New York State Association of Realtors, Inc. v. Shaffer, 27 F.3d 834, 838 (2d Cir.), cert. denied, 513 U.S. 1000 (1994).

Further, we note that although a district court may, on an appropriate record, grant summary judgment sua sponte--after giving the party against which the court is contemplating such a decision notice and an opportunity to present evidence and arguments in opposition, see, e.g., B.F. Goodrich v. Betkoski, 99 F.3d 505, 531 (2d Cir. 1996)--the court, in considering such a decision, is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party, see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991). Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict in favor of the party against which summary judgment is contemplated. See, e.g., Anderson, 477 U.S. at 248.

Finally, we emphasize that the fact that a party who has moved for summary judgment in his own favor has not shown that he is entitled to judgment as a matter of law does not mean that it is appropriate to grant summary judgment against him. See, e.g., id. at 248-49 ("[T]he issue of material fact required . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the

claimed factual dispute be shown." (internal quotation marks omitted) (emphasis added)); Brown v. Cara, 420 F.3d 148, 160-61 (2d Cir. 2005). Thus, in deciding a party's summary judgment motion, the district court is required to view the record in the light most favorable to the party against which summary judgment is sought. But in considering whether to grant summary judgment against the moving party sua sponte, the court is required to view the evidence in the moving party's favor.

###    3.    The Evidence that LHC and Zimmerman Operated as One

With respect to the question of whether LHC and Zimmerman operated as a single entity, the record contains, inter alia, financial records of LHC and deposition testimony from Zimmerman and LHC's CFO, Whittier. The evidence discussed below, taken in the light most favorable to NetJets, shows, inter alia, that LHC, of which Zimmerman is the sole member-owner, was started with a capitalization of no more than $20,100; that LHC proceeded to invest millions of dollars supplied by Zimmerman, including some $22 million in an internet technology company eventually called Bazillion, Inc. ("Bazillion"); and that Zimmerman put money into LHC as LHC needed it, and took money out of LHC as Zimmerman needed it.

Whittier, who had known Zimmerman since 1980 and worked with him full time from 1996 until April 2002 (see, e.g., Deposition of James P. Whittier ("Whittier Dep.") at 10-12), was LHC's only officer other than Zimmerman (see Affidavit of Laurence Zimmerman dated October 14, 2004 ("Zimmerman Aff."), ¶ 16). In addition to

- 18 -

LHC, Zimmerman directly or indirectly owned or controlled a number of companies, including Landover Telecom Corporation ("Landover Telecom"), LandTel N.V. ("LandTel"), IP II Partners, LP ("IP II"), Fox Lair Holdings Corporation ("Fox Lair"), and Kimlar Consulting Corporation ("Kimlar"). (See Whittier Dep. 66-67, 70, 72-73, 78.) Whittier acted as CFO for each of those companies. (See id. at 23, 68, 71, 72, 74, 79.) During most of the period 1996 to April 2002, Whittier "got paid from either Mr. Zimmerman or one of his corporations." (Id. at 14.)

Zimmerman formed LHC in 1998; for most of its operating life, it shared office space with some of Zimmerman's other companies; LHC employed no more than five-to-seven people at any given time; and some of its employees worked for both LHC and Zimmerman's other companies or for LHC and Zimmerman personally. (See Whittier Dep. 24; Deposition of Laurence Zimmerman, October 1, 2003 ("Zimmerman Dep. I"), at 58.) Whittier ran much of LHC's day-to-day operations based on instructions, general or specific, received from Zimmerman. (See Whittier Dep. 23, 39.)

Zimmerman formed LHC "to be used as an investment vehicle for Mr. Zimmerman for him to make investments." (Id. at 19.) "With regards to investments, Mr. Zimmerman reviewed investments. If he decided to go forward after his review, he would make an investment through [LHC] to an investment corporation he wanted to invest in." (Id. at 22.) Although Zimmerman sought Whittier's advice as to the best way of accomplishing something he had decided he wanted to do (see id. at 23), the ultimate decisions were always made by

Zimmerman. "There were no decisions, financial decisions, made with regard to LHC without Mr. Zimmerman's approval." (Id. at 22.)

Whittier testified that LHC also "was an operating company which maintained a consulting agreement with another entity called Landtel NV." (Id. at 19.) But LandTel, which was wholly owned by Zimmerman's Landover Telecom--and was apparently LHC's only paying client--did not come into existence until January 2000 (id. at 69-70), and LHC records do not show receipt of any consulting fees from LandTel until July 2000. Until LandTel was formed, therefore, the day-to-day LHC operations run by Whittier apparently consisted only of making Zimmerman's investments and carrying on Zimmerman's personal business:

> Q. What was your role with regard to LHC?
>
> A. I was acting chief financial officer.
>
> Q. What were your responsibilities as chief financial officer?
>
> A. They were defined by Mr. Zimmerman. I basically tried to carry out what Mr. Zimmerman's wishes were.
>
> . . . .
>
> Q. What did your day-to-day responsibilities with regard to Mr. Zimmerman include?
>
> A. They varied. It was working on a potential investment that LHC might make; it was overseeing the consulting agreement that it had, might have had, that it did have with Landtel, and it was personal business.
>
> Q. By "personal business," do you mean the personal business of Mr. Zimmerman?
>
> A. Sure.
>
> Q. Do you mean anything else by "personal

business"?

        A.  No.

(Whittier Dep. 23, 24 (emphases added).)  Whittier's compensation was paid sometimes by LHC and sometimes by Zimmerman personally. (See id. at 14.)

        In connection with Zimmerman's personal business, LHC's records show numerous transfers of money by Zimmerman to LHC, as well as numerous transfers of money from LHC to Zimmerman.  Some of the transfers by Zimmerman to LHC were for the purpose of having LHC make investments, principally in Bazillion.  Other transfers by Zimmerman to LHC were made for the purpose of meeting LHC's operating expenses:

> To the extent that the corporation had to pay operating expenses like rent, telephone, copy, employees, if there was not sufficient capital in the corporation, he would then advance the money personally to the corporation to meet these obligations.

(Whittier Dep. 27.)  Whittier testified that Zimmerman would transfer funds to LHC "as needed."  (Id. at 26; see also id. at 61 ("Monies would go in . . . LHC based on the need.").)  Often those funds would come from Zimmerman's personal bank accounts.  However, because Zimmerman generally waited until the eleventh hour to provide money to meet LHC's operating needs, sometimes "shortcuts" were taken by having the money come to LHC directly from one of Zimmerman's other companies (id. at 46-47) such as Landover Telecom, Kimlar, Fox Lair, or IP II, none of which had any business relationship with LHC (see, e.g., Deposition of Laurence S. Zimmerman, February 20, 2004 ("Zimmerman Dep. II"), at 16, 24, 26;

- 21 -

Whittier Dep. 68, 75).

Whittier testified also that "[m]onies would go . . . _out of LHC_ based on the need." (Whittier Dep. 61 (emphasis added).) For example, Zimmerman would take money out of LHC to "mak[e] an investment in another entity." (_Id_. at 41.) In addition, at several brokerage firms, Zimmerman had personal accounts that were unrelated to LHC's operations; he had many margin calls in those accounts (_see id_. at 60) because he "utilized margin debt very aggressively," especially with respect to two stocks whose market prices dropped sharply in 2000 (_id_. at 59 (one "from a high of above 90 down to the 60s" and the other "from a high of 93 down to 3")). Zimmerman had LHC make payments to meet some of these margin calls in his personal accounts. On May 15 and 16, 2000, for example, LHC wired a total of $2 million to Salomon Smith Barney to meet margin calls or reduce the margin debt on Zimmerman's personal brokerage accounts. (_See id_. at 50-51, 60-62.) On August 22 and October 6, 2000, LHC sent Paine Webber, another firm at which Zimmerman personally had "big brokerage accounts" (_id_. at 44), checks totaling $2 million. Some of the money that LHC used to pay Zimmerman's margin calls was "loan money" that Zimmerman had put into LHC. (Whittier Dep. 61 (describing the money as being "repatriated back to Mr. Zimmerman").) Other money used to meet Zimmerman's margin calls was money that LHC received from a third party ("Riverside") purchasing a share of an LHC asset. Thus, the $2 million that LHC paid to Salomon Smith Barney in May 2000 was money that Riverside paid LHC to buy participation in a Bazillion convertible

- 22 -

subordinated note owned by LHC. Riverside "bought [participation in the note] directly from LHC" (id. at 64); but Riverside's payment to LHC was used to meet margin calls in Zimmerman's personal brokerage accounts (id. at 62-64).

LHC also transferred money to Zimmerman, or to third persons on his behalf, in connection with his living expenses. For example, LHC made payments to Fox Lair (consistently called "Fox Liar" in LHC's general ledger), a Zimmerman corporation that owned a $15 million New York apartment on Park Avenue, which was characterized by Zimmerman as "a corporate residence" but was used by no one other than Zimmerman and his family (Zimmerman Dep. II, at 28). Fox Lair needed money "to pay phone bills and cleaning people and things of that nature" (Whittier Dep. 80); according to LHC's ledgers, from December 5, 2000, through July 2, 2001, Fox Lair received some $70,000 from LHC. In addition, LHC made periodic payments to the Screen Actors Guild (of which Zimmerman's wife was a member) for health insurance for Zimmerman and his family (see id. at 49-50); LHC purchased a Bentley automobile at a cost of approximately $350,000 for Zimmerman's personal use, placing title in his name (see Zimmerman Dep. I, at 68-69); and LHC made a payment of $110,000, characterized in its general ledger as "Loan receivable" and in its check register as "Interest Expense," to a person who had no connection with LHC but who held a mortgage on a property owned by Zimmerman personally (see Zimmerman Dep. II, at 28-29).

In addition, many of the air hours to which LHC was

entitled under its agreements with NetJets were used by Zimmerman personally. Of the 40-odd LHC flights invoiced by NetJets, Zimmerman acknowledges that "approximately 6" were for vacations for himself and/or his wife. (Zimmerman Aff. ¶ 12.) But in addition to those six, there were at least an equal number of flights that apparently had no relation to LHC's business. These flights included several that transported Zimmerman's family to and from Europe or to and from one of Zimmerman's five homes. Zimmerman contends that use of LHC air hours for these purposes was "part of [his compensation] package" (Zimmerman Dep. I, at 41) and "[o]ne of the perks of being the chairman" (id. at 39-40). That may be; but for purposes of determining whether Zimmerman and LHC were alter egos, it is pertinent that Zimmerman made all of LHC's financial decisions (see, e.g., Whittier Dep. 22, 39-40); Zimmerman alone decided what his perks and package would be.

In LHC's general ledger, each of the transfers of money between LHC and Zimmerman--in either direction--is labeled "Loan receivable." They were also so labeled regardless of whether Zimmerman's payment to LHC was to be used to make an investment or was to be used for operating expenses. Whittier, who had responsibility for LHC's financial records, testified that the ledger treated Zimmerman's payments to and withdrawals from LHC as loans and loan repayments in order to allow Zimmerman to make withdrawals as he needed money, without having to pay taxes on the moneys withdrawn. (See, e.g., id. at 34.) Thus, aside from Zimmerman's initial capital contribution to LHC (which Whittier

thought was $100), "any monies that Mr. Zimmerman . . . deposited into LHC should have been designated as loans" (id. at 38-39, 25). The decision that those transactions would be labeled loans or loan repayments was made by Zimmerman. (See id. at 39.)

"There were no written agreements" with regard to any of Zimmerman's loans (id.); nor were there any "set repayment program" or agreements as to repayment terms (id. at 40): "Money was put in as needed and when money was not needed and Mr. Zimmerman needed money elsewhere, he might transfer it out. That was his decision to make." (Id. at 40 (emphasis added).) "There was no procedure. Money was put in and taken out as needed." (Id. at 62 (emphasis added).)

In all, LHC's financial records for the period January 1, 2000, through June 18, 2002, show--in addition to some two dozen transactions between LHC and Zimmerman's other companies-- approximately 60 transfers of money directly from Zimmerman to LHC and approximately 60 transfers of money out of LHC directly to Zimmerman. In sum, there is evidence that, inter alia, Zimmerman created LHC to be one of his personal investment vehicles; that he was the sole decisionmaker with respect to LHC's financial actions; that Zimmerman frequently put money into LHC as LHC needed it to meet operating expenses; that LHC used some of that money, as well as some moneys it received from selling shares of one of its assets, to pay more than $4.5 million to third persons for Zimmerman's personal expenses including margin calls, mortgage payments, apartment expenses, and automobiles; and that with no written

agreements or documentation or procedures in place, Zimmerman directly, on the average of twice a month for 2½ years, took money out of LHC at will in order to make other investments or to meet his other personal expenses. This evidence is ample to permit a reasonable factfinder to find that Zimmerman completely dominated LHC and that he essentially treated LHC's bank account as one of his pockets, into which he reached when he needed or desired funds for his personal use. Accordingly, we reject Zimmerman's contention that the district court should have granted summary judgment in his favor on the ground that he and LHC did not operate as a single economic entity.

4. The Evidence of Fraud, Illegality, or Injustice

The district court ruled that NetJets had not adduced sufficient evidence to show that there was any fraud or unfairness in Zimmerman's operation of LHC because the court believed it could not consider, with regard to that issue, any of the factors that showed that Zimmerman and LHC operated as a single entity. In so ruling, the court stated that "'[t]o hold otherwise would render the fraud or injustice element meaningless . . . .'" 2006 WL 1627899, at *6 (quoting Mobil Oil, 718 F. Supp. at 268). Mobil Oil, however, did not suggest that there can be no overlap in the proof as to unity of ownership and the proof of unfairness. Rather, it stands for the proposition that the claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit: "The underlying cause of action does not

supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless . . . ." 718 F. Supp. at 268. This proposition has been endorsed by the Delaware courts. See, e.g., Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc., 685 A.2d 724, 729 (Del. Super. 1996) (citing Mobil Oil for the proposition that "[t]he 'injustice'" that must be shown in order to pierce the veil on an alter-ego theory "must be more than the breach of contract alleged in the complaint"). But nothing prevents a court, in determining whether there is sufficient evidence of fraud or unfairness, from taking into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one.

Much of the evidence described in Part II.B.3. above, along with other evidence discussed below, reveals that NetJets adduced sufficient evidence of fraud, illegality, or unfairness to warrant a trial on its contract and account-stated claims against Zimmerman as LHC's alter ego. For example, in an effort to parry NetJets's contention that LHC was undercapitalized, Zimmerman submitted an affidavit from LHC's accountant stating that "it was not intended by Zimmerman to treat the monies paid into LHC as loans" (Affidavit of Mark Balaban dated October 14, 2004, ¶ 6) and that all of Zimmerman's payments into LHC were in fact capital contributions (see id. ¶¶ 4-8). Yet, as discussed above, Whittier testified that Zimmerman instructed him that those payments were to be characterized as loans, in order to allow Zimmerman to take money out of LHC at will and to do so without tax consequences.

Further, although the Balaban affidavit stops short of giving an opinion as to how to characterize Zimmerman's withdrawals of money from LHC, it would appear that, if his payments to LHC were capital contributions as the Balaban affidavit opines, LHC's payments to Zimmerman would be properly characterized as distributions. Yet the DLLCA provides generally, with some qualifications, that an LLC "shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company . . . exceed the fair value of the assets of the limited liability company." Del. Code tit. 6, § 18-607(a). Given that LHC ceased operating and was unable to pay its debt to NetJets, if Zimmerman's withdrawals left LHC in that condition those withdrawals may well have been prohibited by § 18-607(a). A factfinder could infer that Zimmerman's payments to LHC were deliberately mischaracterized as loans in order to mask the fact that Zimmerman was making withdrawals from LHC that were forbidden by law, and could thereby properly find fraud or an unfair siphoning of LHC's assets.

The record also includes other evidence from which a reasonable factfinder could find that Zimmerman operated LHC in his own self-interest in a manner that unfairly disregarded the rights of LHC's creditors. For example, it could find

- that although LHC was apparently unable in 2000 to pay its $340,840.39 (net of LHC's deposit) debt to NetJets, in that year LHC bought, and gave Zimmerman title to, a Bentley automobile for $350,210.95;

- that LHC's only paying client for its consulting

- 28 -

services began paying LHC for those services in July 2000 (the month in which LHC terminated its agreements with NetJets), sending LHC a first payment of approximately $675,000 on July 9, and that on that day Zimmerman withdrew that amount and more from LHC;

- that from the point at which LHC terminated its relationship with NetJets in July 2000 until the end of 2001--the year in which NetJets ceased operations--LHC's records of its transactions directly with Zimmerman indicate that Zimmerman withdrew from LHC approximately $750,000 more than he put in;

- and that, excluding moneys put into LHC solely for its investments in Bazillion, the total amount of money taken out of LHC by Zimmerman and his other companies appears to exceed the amount that he and those companies put into LHC by some $3 million.

From this record, a reasonable factfinder could properly find that there was an overall element of injustice in Zimmerman's operation of LHC. Summary judgment should not have been entered dismissing NetJets's breach-of-contract and account-stated claims against Zimmerman.

We reject, however, NetJets's contention that the evidence supporting its claims against Zimmerman on the alter-ego theory was such as to entitle NetJets to summary judgment in its favor. In this opinion, we have dealt with the granting of summary judgment against NetJets and accordingly we have, as required, viewed the evidence in the light most favorable to NetJets; a factfinder after trial, however, is not required to view the evidence in this light. Both the question of whether LHC was operated as Zimmerman's alter ego and the question of whether it was so operated in a way that shows fraud, illegality, bad faith, or an overall element of injustice or unfairness, remain to be answered by the factfinder after trial.

CONCLUSION

We have considered all of defendants' contentions in support of the dismissals challenged by NetJets on this appeal and have found them to be without merit. For the reasons stated above, the judgment of the district court is vacated insofar as it dismissed the breach-of-contract claims against LHC and the breach-of-contract and account-stated claims against Zimmerman; with respect to those claims, the case is remanded for further proceedings not inconsistent with this opinion.