**Brian S. COHEN, Plaintiff,**

v.

**Theodore F. SCHROEDER, Defendant.**

**No. 15 Civ. 6881 (RJS)**

United States District Court,
S.D. New York.

Signed March 31, 2017

Alison Irene Stein, Andrew Harrison Bart, Gretchen O'Grady Stertz, and Brian Jason Fischer of Jenner & Block LLP, 919 Third Avenue, 37th Floor, New York, New York, 10022, for Plaintiff Brian S. Cohen.

David Dormont and Sidney Stephen Liebesman of Montgomery, McCracken, Walker & Rhoads, LLP, 123 South Broad Street, Philadelphia. PA 19109, for Defendant.

## OPINION AND ORDER

Richard J. Sullivan, District Judge:

Plaintiff Brian S. Cohen ("Cohen") brings this action against Theodore F. Schroeder ("Schroeder") alleging that Schroeder is the alter ego of Skoop Media Associates, Inc. ("Skoop"), a small, non-public Delaware corporation that both Cohen and Schroeder have served as directors and officers. (Doc. No. 1 ("Compl.").) Cohen seeks to hold Schroeder personally liable for indemnification and advancement obligations owed by Skoop to Cohen under a judgment obtained in the Delaware Court of Chancery in 2015.

Although this litigation has, to date, borne all the earmarks of a street fight, in which each side has repeatedly accused the other of "impure motives" and "ethical misconduct" (Doc. No. 36), this case is in fact a side show. The main event in the parties' long-running legal battle is occurring across the street before the Honorable O. Peter Sherwood in the Commercial Division of the New York State Supreme Court. There, Schroeder, Skoop, and Rendezvoo LLC ("Rendezvoo") have sued Cohen, Pinterest, Inc., and Cohen's not-for-profit corporation, New York Angels, Inc., alleging, among other things, that they stole intellectual property and misappro-

priated trade secrets belonging to Schroeder, Rendezvoo, and Skoop in creating the popular social media platform known as "Pinterest." *Schroeder v. Pinterest, Inc.,* No. 652183/13, 2013 WL 3111177 (N.Y. Sup. Ct. June 20, 2013) ("Pinterest Litigation").

In this ancillary case, Cohen has moved for summary judgment to dismiss Cohen's claim for veil piercing pursuant to Federal Rule of Civil Procedure 56. (Doc. No. 84.) For the reasons set forth below, Schroeder's motion is granted.

## I. BACKGROUND [1]

The parties first met in January 2007, when Schroeder and his fellow Columbia Law School classmates Brandon Stroy and William Bocra made a presentation to Cohen—an investor who has provided capital to over twenty start-up companies—regarding Rendezvoo, a social media platform that they were developing. (Def. 56.1 Stmt. ¶ 20; Pl. Opp'n 56.1 Stmt. ¶ 59; *see also* Doc. No. 86–2 at 163:9–11.) Although Cohen declined to invest in Rendezvoo, he offered to help Schroeder, Bocra, and Stroy "refine their investment pitch," and ultimately agreed to support development of a different site, Skoopwire.com. (Pl. Opp'n 56.1 Stmt. ¶¶ 59–60.) On June 29, 2007, the quartet incorporated Skoop as a Delaware corporation, with Cohen, Schroeder, Bocra, and Stroy serving as Skoop's sole directors. (Def. 56.1 Stmt. ¶¶ 2–4.) While Cohen served as Skoop's Chief Executive Officer and Chairman of the Board, Schroeder served as President and Chief Technology Officer and Bocra as Chief Operating Officer. (*Id.* ¶¶ 5–8.) Skoop also secured corporate counsel in Delaware and adopted by-laws. (*Id.* ¶ 9; *see also* Doc. No. 86–23.) Article 7 of Skoop's certificate of incorporation included a guarantee, pursuant to Section 145 of the Delaware General Corporation Law, to advance the expenses, including attorney's fees, incurred by current or former officers or directors "by reason of" their service to Skoop and to indemnify their expenses in cases where they prevail. (Doc. No. 94–9 ¶¶ 2–3.) Although the four men discussed dividing ownership of Skoop, the corporation never issued stock certificates. (Doc. No. 94–1 at 223:11–15.) Furthermore, the directors never reached a formal agreement "delineating what intellectual property, if any, ... Schroeder had brought into [Skoop] ... versus what intellectual property, if any, had accrued to [Skoop] as a result of the group's development efforts." (Pl. Opp'n 56.1 Stmt. ¶ 61 (citing Doc. No. 94–1 at 85:5–87:8, 129:7–23).)

By late 2007, Cohen, Schroeder, Bocra, and Stroy ceased developing Skoopwire.com. (Def. 56.1 Stmt. ¶¶ 10–11; Doc. No. 94–1 at 107:10–19.) Although the four men attempted to work out an agreement to liquidate the corporation in March 2008, they never reached consensus and never consummated a separation agreement delineating their respective ownership interests in Skoop. (Def. 56.1 Stmt. ¶¶ 12–19.) Later that year, Cohen disassociated himself from Skoop, but he was never formally removed from Skoop's board. (Def. 56.1 Stmt. ¶ 21; Doc. No. 94–4 at 38:9–11.)

---

1. The facts are drawn from Schroeder's Local Civil Rule 56.1 Statement (Doc. No. 87 ("Def. 56.1 Stmt.")), Cohen's Counterstatement (Doc. No. 93 ("Pl. Opp'n 56.1 Stmt.")), the declarations submitted in support of and in opposition to the motion, and the exhibits attached thereto (Doc. Nos. 86, 94). unless otherwise noted, where only one party's 56.1 Statement or Counterstatement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In resolving the motion, the Court has also considered Schroeder's memorandum of law in support of his motion (Doc. No. 85 ("Mem.")), Cohen's opposition brief (Doc. No. 92 ("Opp'n")), and Schroeder's reply (Doc. No. 96 ("Reply")).

Since 2008, Skoop has failed to pay any dividends, pass a single board resolution, issue annual reports, hire a single employee, raise any money, submit any credit card or loan applications, or produce a single product. (Pl. Opp'n 56.1 Stmt. ¶ 101 (citing Doc. 94–4 at 36:8–40:15).) Between 2007 and 2013, Skoop did not pay any taxes to the state of Delaware and became a "void" corporation. (Doc. No. 94–2 at 2.)

In the years after his departure from Skoop, Cohen invested in the company that developed the popular social media platform Pinterest. (Def. 56.1 Stmt. ¶¶ 23–24; *see also* Doc. No. 86–8.) [2] In December 2012, Schroeder sued Cohen and Pinterest in the United States District Court for the Southern District of New York, alleging that Cohen had misappropriated intellectual property and trade secrets belonging to Schroeder and transmitted those ideas to Pinterest. (Def. 56.1 Stmt. ¶ 25.) On February 12, 2013, Cohen wrote a pre-motion letter to the Honorable P. Kevin Castel, the judge assigned to that case, in contemplation of a motion to dismiss Schroeder's complaint on the ground that Schroeder lacked standing to sue because of his failure to include Skoop and Rendezvoo, who Cohen asserted were the real parties in interest and owners of the intellectual property · at issue. (*Id.* ¶ 29.) In a letter response to Judge Castel, dated February 13, 2013, Schroeder represented that the intellectual property associated · with skoopwire.com and rendezvoo.com belonged to him. (Doc. No. 94–12 at 2.) Nonetheless, on February 27, 2013, Schroeder filed an amended complaint joining Rendezvoo and Skoop as parties and adding claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty. (Doc. No. 86–12.) Judge Castel thereafter dismissed the amended complaint for lack of subject matter jurisdiction, since both the corporate plaintiffs and corporate defendant were domiciled in Delaware, thereby destroying diversity. (Def. 56.1 Stmt. ¶ 34.) On June 20, 2013, Schroeder, Rendezvoo, and Skoop revived their suit in New York State Supreme Court. (Doc. No. 86–21.) Although Pinterest has been dismissed from that action, *see Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 17 N.Y.S.3d 678 (1st Dep't 2015), the other defendants' summary judgment motion is currently pending, *see* No. 652183/13 (N.Y. Sup. Ct. Oct. 7, 2016).

On October 6, 2014, Schroeder, Bocra, and Stroy entered an "agreement of interest in lawsuit" ("Agreement of Interest"), in which they "acknowledge[d] each party's interest in any settlement proceeds resulting from" the Pinterest Litigation. (Doc. No. 86–17 at 1.) As part of the agreement, the three men stipulated that Schroeder would be entitled to 75.6% of the interest in the Pinterest Litigation; Bocra would be entitled to 16%; and Stroy would be entitled to 8.4%. (*Id.*) Accordingly, "[a]ny recovery in the Pinterest Litigation will ultimately inure to the benefit of Schroeder, Bocra, and Stroy." (Def. 56.1 Stmt. ¶ 37.) The Agreement of Interest also contained a clause whereby the three men "ratified, confirmed and approved" Schroeder's initiation of the Pinterest Liti-

---

**2.** As of 2016, Pinterest drew approximately 150 million monthly users, and as of 2015, the company was valued at $11 billion. *See* Kathleen Chaykowski, *Pinterest Reaches 150 Million Monthly Users, Boosts Engagement Among Men*, Forbes (Oct. 13, 2016), https://www.forbes.com/sites/kathleenchaykowski/2016/10/13/pinterest-reaches-150-million- monthlyusers/#3156e2d5732e; Michael J. de la Merced, *Pinterest Valuation at $11 Billion After New Round of Fund–Raising*, N.Y. Times (Mar. 16, 2016), https://www.nytimes.com/2015/03/17/business/dealbook/pinterest-valuation-at-11-billion-after-newround-of-fund-raising.html.

gation on Skoop's behalf. (Doc. No. 86–17 ¶ 4.)

In November 2014, Cohen sued Skoop in the Delaware Court of Chancery seeking (1) indemnification of his expenses incurred in the federal suit dismissed by Judge Castel and (2) advancement of his expenses incurred in the suit pending in New York State Supreme Court pursuant to Article 7 of Skoop's certificate of incorporation. (Def. 56.1 Stmt. ¶ 39; *see also* Doc. No. 86–10.) In paragraph 63 of his Delaware complaint, Cohen alleged, "upon information and belief," that Skoop "has no assets to pay a judgment," and therefore he "reserve[d] the right to enforce, and fully intend[ed] to enforce expeditiously, any judgment entered against [Skoop] against Mr. Schroeder personally, on the basis that [Skoop] is, in fact, a mere instrumentality and alter ego of Mr. Schroeder." (Doc. No. 86–10 at 63–64; *see also* Doc. No. 94–5 at 82:4–14, 84:11–15 (acknowledging in a subsequent deposition that he "wasn't sure" Skoop had the assets to pay any judgment at the time he filed suit in Delaware).) On June 4, 2015, the Delaware Court of Chancery granted Cohen's motion for summary judgment against Skoop. (Doc. No. 94–9.) To date, Skoop has failed to pay this judgment ("Delaware Judgment") to Cohen. (Pl. Opp'n 56.1 Stmt. ¶ 58.)

On August 31, 2015, Cohen filed suit against Schroeder in this Court on a single cause of action for veil piercing. Specifically, Cohen seeks: (1) a declaration that Skoop is Schroeder's alter ego, and (2) a judgment issued by this Court against Schroeder for the full amount of the Delaware Judgment. (Compl. ¶ 93.) On March 16, 2016, the Court issued an opinion and order denying Schroeder's motion to dismiss pursuant to Rule 12(b)(6). *Cohen v. Schroeder*, No. 15-cv-6881 (RJS), 2016 WL 1070851 (S.D.N.Y. Mar. 16, 2016). On May 27, 2016, discovery—which the parties conducted with a startling degree of acrimony—closed. (Doc. No. 61; *see also* Doc. No. 36.) On July 14, 2016, Schroeder filed the instant motion for summary judgment (Doc. No. 84), which was fully briefed on September 16, 2016 (Doc. No. 96).

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be

drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'—that is, point[s] out ...—that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III. Discussion [3]

▮▮▮ Under Delaware law, "a court may impose personal liability on a corporation's owner when there is fraud or the corporation 'is in fact a mere instrumentality or alter ego of its owner.'" *Wilson v. Thorn Energy, LLC,* 787 F.Supp.2d 286, 294 (S.D.N.Y. 2011) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 176 (2d Cir. 2008)).[4] Specifically, a plaintiff must show: "(1) that the business entity and its owner 'operated as a single economic entity' and (2) that [there

was] 'an overall element of injustice or unfairness.' " *NetJets,* 537 F.3d at 174 (alteration in original) (citation omitted). "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces 'a difficult task.' " *Fletcher,* 68 F.3d at 1458 (quoting *Harco Nat. Ins. Co. v. Green Farms. Inc.,.* No. CIV.A. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). "Delaware courts ... will disregard the corporate form only in the 'exceptional case.' " *Case Fin., Inc. v. Alden,* No. CIV.A. 1184 (VCP), 2009 WL 2581873, at *4 (Del. Ch. Aug. 21; 2009) (quoting *Sprint Nextel Corp. v. iPCS, Inc.,* No. CIV.A. 3746 (VCP), 2008 WL 2737409, at *11 (Del. Ch. July 14, 2008)); *see also Base Optics Inc. v. Liu,* No. CV 9803 (VCG), 2015 WL 3491495, at *23 (Del. Ch. May 29, 2015) (explaining that veil-piercing is an "extraordinary equitable remedy"). Accordingly, "[a]lthough the question of domination is generally one of fact, courts have granted motions to dismiss as well as motions for summary judgment ... where there has been a lack of sufficient evidence to place the alter ego issue in dispute." *Fletcher,* 68 F.3d at 1458.

### A. Operation as a "Single Economic Entity"

▮▮▮ First, the Court considers whether Skoop and Schroeder "operated as a single economic entity." *NetJets,* 537 F.3d at 174. Under this prong, courts examine

---

3. There is no dispute that subject matter jurisdiction over this case is appropriate, since Cohen is a citizen of New York, Schroeder is a citizen of New Jersey, and the amount in controversy exceeds $75,000. (Doc. No. 59 ¶¶ 6–7); *see also* 28 U.S.C. § 1332(a).

4. The Court applies Delaware's veil-piercing law, since Skoop is a Delaware corporation, and "under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.,* 68 F.3d

1451, 1456 (2d Cir. 1995) (brackets and internal quotation marks omitted). Even so, as Cohen correctly notes, "the standards for piercing the corporate veil are substantially similar under Delaware and New York law." (Opp'n 14 n.6 (quoting *Wausau Bus. Ins. Co. v. Turner Const. Co.,* 141 F.Supp.2d 412, 417 (S.D.N.Y. 2001))); *accord LaCourte v. JP Morgan Chase & Co.,* No. 12-cv-9453 (JSR), 2013 WL 4830935, at *6 n.2 (S.D.N.Y. Sept. 4, 2013) ("New York and Delaware veil-piercing law do not materially differ."). Therefore, the Court also relies on cases applying New York veil-piercing law as persuasive authority.

"factors which reveal how the corporation operates and the particular defendant's relationship to that operation." *Id.* at 176–77 (citation omitted). These factors include:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Id.* at 177 (citation omitted). "While "no single factor c[an] justify a decision to disregard the corporate entity, ... some combination of them [i]s required." *Harper v. Del. Valley Broads., Inc.*, 743 F.Supp. 1076, 1085 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991) (citation omitted). "Stated generally, the inquiry initially focuses on whether 'those in control of a corporation' did not 'treat[ ] the corporation as a distinct entity.' " *NetJets*, 537 F.3d at 177 (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987)).

### 1. Siphoning

The Court starts with Cohen's contention that Schroeder has "siphoned" Skoop's assets. *NetJets*, 537 F.3d at 177. While Cohen concedes that Schroeder has never misappropriated any funds belonging to Skoop (Pl. Opp'n 56.1 Stmt. ¶¶ 54–55), he nonetheless insists that Schroeder has "improperly deal[t] between corporate and individual assets" (Opp'n 20). His sole ground for this contention is that Cohen has been "total[ly]" unable "to distinguish between the personal and the corporate intellectual property at issue" in the Pinterest Litigation, which Schroeder has at times asserted belongs exclusively to him, but has also argued, in the alternative,

belongs to Skoop. (*Id.*) For instance, Schroeder insisted in a February 2013 letter to Judge Castel that he never transferred any intellectual property to Skoop, yet only days later, he amended his complaint to add Skoop as a plaintiff. (Pl. 56.1 ¶ 67 (citing Doc. No. 94–12).) According to Cohen, this behavior amounted to "an outright pilfering of corporate property for [Schroeder's] own personal gain." (Opp'n at 22.) At the 12(b)(6) stage, when it was required to accept the truth of Cohen's allegations and lacked the benefit of an evidentiary record, the Court found similar allegations adequate to state a claim. *Cohen*, 2016 WL 1070851, at *4 (finding that Cohen had sufficiently alleged that Cohen was "operating" Skoop, an otherwise defunct and insolvent entity, "in his own self-interest" and "for the sole purpose of using it as a vehicle through which to pursue his own claims against [Cohen] and others ...").

■ But upon review of the record, it is clear that Cohen's argument is specious. In pursuing the Pinterest Litigation on Skoop's behalf, Schroeder has sought to preserve the corporation's only potential asset—the intellectual property allegedly stolen by Cohen. (*See* Doc. Nos. 86–12, 86–21.) There is simply nothing wrong or even unusual about the fact that a corporation's president has taken the steps necessary to assert claims against an allegedly faithless director and officer, or the fact that Schroeder has argued, in the alternative, that the relevant property in the Pinterest Litigation belongs to him. Indeed, the "baseline rule" is that "a plaintiff is generally permitted to plead and prove his or her case on alternative and sometimes inconsistent theories of liability." *Thieriot v. Jaspan Schlesinger Hoffman, LLP*, No. 07-cv-5315 (DRH) (AKT), 2016 WL 6088302, at *5 (E.D.N.Y. Oct. 18, 2016) (quoting *Bussolari v. City of Hartford*, No.

3:14-cv-00149 (JAM), 2016 WL 4272419, *4 (D. Conn. Aug. 12, 2016)). Furthermore, the undisputed evidence now before the Court reveals that Schroeder, Bocra, and Stroy, who are all trained in the law and are all members of the New York bar, entered an arm's length agreement to share any recovery in the Pinterest Litigation on a pro rata basis. (Def. 56.1 Stmt. ¶¶ 37, 54; Doc. No. 86–17.) Thus, it is clear that Schroeder is *not* pursuing the Pinterest Litigation exclusively "in his own self-interest." Rather, as Cohen concedes, "any recovery in the Pinterest Litigation will ultimately inure to" three of Skoop's four original co-founders. (Pl. Opp'n 56.1 Stmt. ¶ 37.)

Accordingly, Cohen's inflammatory accusation that Schroeder has "pilfer[ed]" Skoop's intellectual property (Opp'n 22) is simply hollow bombast. The Court has little trouble concluding, as a matter of law, that Schroeder has never siphoned any assets belonging to Skoop.

2. Adequate Capitalization and Solvency

▬▬▬ The Court next addresses the related questions of whether Skoop "was adequately capitalized for the corporate undertaking" and whether it "was solvent." *NetJets,* 537 F.3d at 177. As Vice Chancellor Noble once underscored, "mere insolvency is not enough to allow piercing of the corporate veil," since "[i]f creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless." *Mason v. Network of Wilmington, Inc.,* No. CIV.A. 19434 (NC), 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005). Indeed, were "undercapitalization . . . sufficient to pierce the corporate veil," then " 'the veil of every insolvent subsidiary or failed start-up corporation could be pierced.' " *In re BH S & B Holdings LLC,* 420 B.R. 112, 136 (Bankr. S.D.N.Y. 2009) (quoting *In re RSL*

*COM PRIMECALL, Inc.,* No. 01-11457 (ALG), 2003 WL 22989669, at *16 (Bankr. S.D.N.Y. Dec. 11, 2003)), *aff'd as modified,* 807 F.Supp.2d 199 (S.D.N.Y. 2011). Instead, insolvency and undercapitalization are factors to be considered in determining "whether the corporation engaged in conduct that unjustly shields its assets from its creditors." *Mason,* 2005 WL 1653954, at *3; *see Zubik v. Zubik,* 384 F.2d 267, 273 (3d Cir. 1967) (recognizing that "[l]imiting one's personal liability is a traditional reason for a corporation," and "[u]nless done deliberately, with specific intent to escape liability for a specific tort or class of torts, the cause of justice does not require disregarding the corporate entity"); 1 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 7:11 (3d ed. 2016) ("[I]nadequate capitalization has correctly assumed a limited role in veil-piercing cases, that of being a surrogate for the probable bad faith of the firm's promoters."). In cases involving start-ups, "courts focus on the initial capitalization" and consider " 'whether a corporate entity was or was not set up for financial failure.' " *In re BH S & B Holdings LLC,* 420 B.R. at 136 (quoting *George Hyman Constr. Co. v. Gateman,* 16 F.Supp.2d 129, 152–53 (D. Mass. 1998)); *cf. Mason,* 2005 WL 1653954, at *4 (suggesting that a veil-piercing plaintiff may meet this element by comparing "capitalization of similar firms in the industry").

There is no dispute that Skoop, a start-up that was an active corporation for under a year, "does not have any significant funds, nor has it ever." (Pl. Opp'n 56.1 ¶ 55; *see also* Doc. No. 94–11 at 2; Opp'n 15–16.) But there is also no evidence that Skoop was "set up for financial failure." *In re BH S & B Holdings LLC,* 420 B.R. at 136–37. To the contrary, Cohen himself devoted "hundreds of hours" to Skoop (Doc. No. 86–2 at 303:19), where he helped Schroeder, Stroy, and Bocra "refine their

investment pitch" and served as Chief Executive Officer and Chairman of the Board (Pl. Opp'n 56.1 ¶ 59; Def. 56.1 Stmt. ¶ 5; *see also* Doc. No. 86–1 at 81:12–14, 200:15–23). Not surprisingly, Cohen has not pointed to any evidence that Skoop's capitalization "was so minimal as to prove that it was a sham entity," nor has Cohen pointed to evidence that the "capitalizations" of similarly situated start-up companies "exceeded" that of Skoop. *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184 (VCP), 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008). And there is absolutely no evidence that Schroeder has taken any step to keep Skoop insolvent for the purpose of shielding the corporation's (or his own) assets from creditors. *See Mason*, 2005 WL 1653954, at *3. Accordingly, Cohen has failed to show that Skoop was inadequately capitalized, and even assuming Skoop is insolvent, that would be insufficient to "warrant piercing the corporate veil." *Id.* at *4.

### 3. Adherence to Corporate Formalities

The Court next turns to "whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed." *NetJets*, 537 F.3d at 177. There is no question Skoop has failed to follow numerous basic corporate formalities, both during its short life in 2007 and after Schroeder revived it in 2013. (*See* Opp'n 17–20.) For instance, Skoop never issued stock certificates and never reached a formal agreement "delineating what intellectual property, if any, . . . Schroeder had brought into [Skoop] . . . versus what intellectual property, if any, had accrued to [Skoop] as a result of the group's development efforts." (Pl. Opp'n 56.1 Stmt. ¶ 61; *see also* Doc. No. 94–1 at 223:11–15.) Since 2008, Skoop still has not issued any stock certificates, paid dividends, passed any board resolutions, issued annual reports, hired any employees, raised money, submitted credit card or loan applications, or

produced a single product. (Pl. Opp'n 56.1 Stmt. ¶ 101 (citing Doc. 94–4 at 36:8–40:15).) In fact, Bocra, who is still a director of Skoop and its titular chief operating officer, did not communicate in any way with Schroeder, the corporation's president, for over four years and was not even aware of Schroeder's initial filings in the Pinterest Litigation, and while Cohen has not been involved with the company since 2008, he also has never been formally removed from its board of directors. (Pl. Opp'n 56.1 ¶¶ 7–8 (citing Doc. No. 94–4 at 35:13–36:7), ¶ 27 (citing Doc. No. 94–4 at 44:17–45:11, 55:24–56:23, 84:5–85:5); *see also* Doc. No. 94–44.) Furthermore, Cohen points to substantial evidence that Schroeder, notwithstanding the fact that he is a practicing lawyer and graduate of Columbia Law School, failed to comply with many basic formalities in his efforts to revive Skoop in 2013. For instance, Schroeder, who filed a "certificate for renewal and revival of charter" and an "annual franchise tax report" on Skoop's behalf with Delaware authorities, indicated on those forms that they were submitted under the "authority of the duly elected directors" of Skoop—Schroeder, Cohen, Stroy, and Bocra—when in fact, neither Bocra nor Cohen had advance knowledge of the filing. (Pl. Opp'n 56.1 Stmt ¶ 99 (citing Doc. Nos. 86–3 at 70:23–74:19, 93–43, 94–44).) Cohen has also pointed to evidence that Schroeder paid Skoop's taxes to the state of Delaware out of his own pocket. (*Id.* ¶ 100 (citing Doc. No. 86–24).)

But the Second Circuit has repeatedly recognized that "with respect to small, privately-held corporations, 'the trappings of sophisticated corporate life are rarely present,' and we must avoid an over-rigid 'preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996)

(quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)); *Zubik*, 384 F.2d at 271 n.4 ("lack of formalities in a closely-held or family corporation has often not been found to have as much consequence as where such a closely-held corporation is not involved"); *Middle States Drywall, Inc. v. DMS Props.First, Inc.*, No. CIV.A 95L-01-041 (SCD), 1996 WL 453418, at *16 n.12 (Del. Super. Ct. May 28, 1996) ("[S]mall, closely-held corporations frequently fail to adhere to corporate formalities, often to their distress."), *aff'd sub nom. DMS Props. First, Inc. v. Middle States Drywall, Inc.*, 692 A.2d 412 (Del. 1997). For these reasons, "courts in this district are 'especially hesitant to find a disregard of the corporate form when closely-held corporations are involved.'" *Feitshans v. Kahn*, No. 06-cv-2125 (SAS), 2007 WL 2438411, at *5 (S.D.N.Y. Aug. 22, 2007) (quoting *Columbia Pictures Indus., Inc. v. Screen Gems Film Co.*, No. 99-cv-4407 (WHP), 2001 WL 1254838, at *10 (S.D.N.Y. Oct. 18, 2001)).

▮ Instead, a corporation's adherence to formalities is merely one of several factors that are used to "determin[e] whether ... the corporation is a 'dummy' for its individual stockholders who are in reality carrying on business in their personal capacities for purely personal rather than corporate ends." *Primex Plastics Corp. v. Lawrence Prods., Inc.*, No. 89-cv-2944 (JSM), 1991 WL 183367, at *6 (S.D.N.Y. Sept. 12, 1991); *accord Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (touchstone of veil-piercing analysis is whether a "corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors"). Accordingly, Skoop's failure to follow corporate formalities does not, on its own, create a jury question on the issue of alter ego liability. *OOO v. Empire United Lines Co.*, 557 Fed.Appx. 40, 46 (2d Cir. 2014), *as corrected* (Feb. 7, 2014) (affirming grant of summary judgment, notwithstanding small corporation's lack of board of directors, company treasurer or secretary, where there was "no evidence whatsoever that [corporation] conducted [sole shareholder's] business as opposed to its own business"); *Tycoons Worldwide Grp. (Thailand) Pub. Co. v. JBL Supply Inc.*, 721 F.Supp.2d 194, 206 (S.D.N.Y. 2010) (granting summary judgment, notwithstanding small corporation's failure to adhere to formalities, where there was no evidence shareholder ever used corporation "to further personal rather than corporate ends").

\* \* \*

For the reasons set forth above, the Court finds that no reasonable jury would conclude that Skoop "simply functioned as a facade" for Schroeder. *NetJets*, 537 F.3d at 177. While Schroeder, a trained lawyer, could be faulted for his repeated failures to comply with corporate formalities, a reasonable jury would have no basis to conclude that Schroeder is carrying on Skoop's business "for purely personal rather than corporate ends." *Primex*, 1991 WL 183367, at *6. In other words, this is obviously not a case where a principal "treated [the corporation's] bank account as one of his pockets, into which he reached when he needed or desired funds for his personal use." *NetJets*, 537 F.3d at 182. To the contrary, Schroeder, acting as the corporation's president, has endeavored to recover the only asset Skoop even potentially owns—its interest in the intellectual property under dispute in the Pinterest Litigation—and he has entered an arm's length agreement with two of Skoop's other cofounders to share any proceeds from the Pinterest Litigation. Even assuming Skoop is insolvent, that fact alone is insufficient to send Plaintiff's veil-piercing claim to the jury, particularly since there is no evidence Skoop was "set up for financial failure." *In re BH S & B Holdings LLC*, 420 B.R. at

136. Because there is "a lack of sufficient evidence to place the alter ego issue in dispute," *Fletcher*, 68 F.3d at 1458, the Court concludes that summary judgment in Schroeder's favor is warranted.

### B. "Overall Element of Injustice or Unfairness"

Even assuming a genuine dispute of fact existed with respect to the first prong of the alter-ego analysis, the Court also concludes that no reasonable jury would find the second element required for veil piercing—an "overall element of injustice or unfairness." *NetJets*, 537 F.3d at 174. Under this second prong of Delaware's alter-ego test, "a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form. In other words, the corporation effectively must exist as a sham or shell through which [a controlling party] perpetrates injustice." *Standex Int'l Corp. v. QCP, Inc.*, No. 16-cv-492 (KPF), 2017 WL 481447, at *6 (S.D.N.Y. Feb. 6, 2017) (quoting *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F.Supp.2d 392, 406 (S.D.N.Y. 2013)); *accord Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F.Supp.3d 430, 492 (S.D.N.Y. 2015). Thus, it is not enough to show that an individual defendant "abused the corporate form." *Doberstein v. G–P Indus., Inc.*, No. CV 9995 (VCP), 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015). Rather, a plaintiff must also show that "through that abuse," the defendant perpetrated an injustice "on an innocent third party." *Id.*

Cohen's veil-piercing claim is particularly problematic under this prong in light of his status as a corporate insider. It is true, as the Court has previously noted, that "a corporate insider or shareholder of a company is not *automatically* barred as a matter of law from bringing an alter-ego claim against that entity." *Cohen*, 2016 WL 1070851, at *4 (citing *Kertesz v. Korn*, 698 F.3d 89 (2d Cir. 2012)). Even so,

veil piercing is only appropriate where an abuse of the corporate form has worked an injustice on "an *innocent third party*," *Doberstein*, 2015 WL 6606484, at *4, since "the policy justifying disregarding the corporate form [is] the need to protect those who deal with the corporation," *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (citation omitted); *also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 269 n.11 (D. Del. 1989) ("[C]ases where the corporate veil is pierced invariably involve some degree of reliance by plaintiff, contributing to the fraud or accenting the injustice." (citing *Zubik*, 384 F.2d at 273)). Accordingly, even if corporate insiders are not automatically barred from piercing the corporate veil, the second element of an alter ego claim is an especially challenging hurdle for them to meet. As the Second Circuit has recognized, "[i]t may be more difficult for a majority shareholder to deceive a fellow insider, which in turn may make it more difficult for an insider to prove the overall injustice or unfairness necessary to pursue an alter-ego claim," since "in contrast to an innocent outsider, a corporate officer is more likely to have inside knowledge of the corporation's activities." *Kertesz*, 698 F.3d at 91.

Cohen is a consummate "insider" of Skoop, having served as director, chief executive officer, and chairman of the board during the company's short history in 2007 and 2008. (Def. 56.1 Stmt. ¶¶ 4–5.) Although Cohen was not involved in the company for several years, the evidence is clear that Cohen knew, or at the very least had reason to know, that Skoop had no assets at the time he filed suit in Delaware Chancery Court in November 2014. In paragraph 63 of Cohen's complaint in the Delaware action, he alleged, "upon information and belief," that Skoop "has no assets to pay a judgment," and therefore he "reserve[d] the right to enforce, and

fully intend[ed] to enforce expeditiously, any judgment entered against [Skoop] against Mr. Schroeder personally, on the basis that [Skoop] is, in fact, a mere instrumentality and alter ego of Mr. Schroeder." (Doc. No. 86–10 at ¶¶ 63–64; *see also* Doc. No. 94–5 at 82:4–14, 84:11–15 (acknowledging that he "wasn't sure" Skoop had the assets to pay any judgment at the time he filed suit in Delaware).) Under these circumstances, no reasonable jury could possibly find that Cohen—a wealthy investor represented by some of the country's most sophisticated lawyers—is an "innocent third party" who suffered an injustice as a result of Schroeder's operation of Skoop. *See Doberstein,* 2015 WL 6606484, at *4; *see also Harper,* 743 F.Supp. at 1086 (denying veil-piercing claim brought by director and shareholder of corporation, since he "was not an innocent outsider" and failed to point to any "unfairness or inequity" besides "the fact that he has not been paid").

In fact, the only "injustice" claimed by Cohen is that Schroeder revived Skoop, an otherwise defunct entity, so that he could prosecute the Pinterest Litigation against Cohen while "avoid[ing] ... the substance of [Cohen's] standing challenge" before Judge Castel. (Opp'n 23; *see id.* at 25 (accusing "Schroeder of employing a defunct, undercapitalized corporation as his litigation prop while refusing to take responsibility for its liabilities").) For the reasons set forth in Section III.A.1, the Court finds nothing unjust or wrongful in Schroeder's decision to allege *both* that *he* owns the intellectual property at issue in the Pinterest Litigation and, in the alternative, that the relevant intellectual property belongs to the *corporate entity.* (*See* Doc. Nos. 86–12, 86–21.) With respect to the latter claim, the undisputed evidence in the record reveals that Schroeder is *not* pursuing the Pinterest Litigation exclusively "for his own personal benefit," since a favorable verdict on that cause of action

will redound to the benefit of the corporation and, indirectly, its shareholders. The Agreement of Interest—by which Schroeder, Bocra, and Stroy delineated their interest in the litigation and ratified Schroeder's prior acts in initiating suit on the corporation's behalf—confirms this fact. (Def. 56.1 Stmt. ¶ 37; Doc. No. 86–17.) Simply put, no reasonable jury would find that Schroeder is using Skoop to perpetrate an "injustice" by initiating the Pinterest Litigation, in which he is working to protect the only potential asset Skoop has—its ownership interest in the disputed intellectual property.

██ And while it is true that Skoop has defaulted on its obligation to advance Cohen's legal fees, as required under Skoop's articles of incorporation, the fact remains that to prevail on prong two of the alter-ego analysis, a party must show that defendant's abuse of "the corporate form in and of itself operates to serve some fraud or injustice, *distinct from the alleged wrongs of the underlying corporation.*" *Trevino v. Merscorp, Inc.,* 583 F.Supp.2d 521, 531 (D. Del. 2008) (citing *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical,* No. Civ. A. 19760 (NC), 2004 WL 415251, at *4 (Del. Ch. Mar. 4, 2004)); *accord NetJets,* 537 F.3d at 183 ("[T]he claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit."); *Nat'l Gear & Piston, Inc.,* 975 F.Supp.2d at 407 (collecting cases). Thus, Skoop's failure to advance and indemnify Cohen for his hefty legal bills, standing alone, is insufficient to establish prong two of Delaware's alter-ego test.

Furthermore, while Schroeder and Skoop's other officers might be faulted for failing to keep the corporation sufficiently capitalized to meet Skoop's indemnification and advancement obligations, there is no evidence that they have deliberately kept

Skoop undercapitalized for this purpose. *See Fletcher*, 68 F.3d at 1461 (granting summary judgment to defendant parent corporation where there was "no indication that [it] sought to defraud creditors and consumers or to siphon funds from its subsidiary"). In other words, this is obviously not a case where "a controlling party intentionally renders a corporation judgment-proof in order to avoid paying obligations to the corporation's creditors." *Am. Fed. Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F.Supp.3d 388, 404 (S.D.N.Y. 2015.). Skoop was effectively judgment-proof long before it joined the Pinterest Litigation, and the fact that Schroeder, as one of its officers, paid from his own pocket certain outstanding taxes and expenses on behalf of the corporation does not render him personally liable for the corporation's remaining liabilities.

In sum, the Court concludes that even assuming a genuine dispute existed as to whether Schroeder "abuse[d]" Skoop's "corporate form," Cohen fails as a matter of law to show that such abuse caused an "injustice" meriting veil piercing. *See Standex*, 2017 WL 481447, at \*6; *see also Allison v. Clos-ette Too, L.L.C.*, No. 14-cv-1618 (LAK) (JCF), 2015 WL 136102, at \*5 (S.D.N.Y. Jan. 9, 2015) (plaintiff failed to state claim for veil piercing, notwithstanding fact that she "allege[d] facts supporting the inference that [subsidiary and parent] operated as a single economic entity," since she failed to "allege that this arrangement was used to perpetrate an injustice or unfairness independent of her own claims"); *Harper*, 743 F.Supp. at 1086 (absent "a showing of the kind of unfairness or injustice necessary to persuade a Delaware court to disregard separate entities, the court will not disregard ... separate legal existences...."). Accordingly, Defendant's motion for summary judgment must be granted.

IV. CONCLUSION

As noted at the outset, the ultimate dispute between Cohen and Schroeder—over whether Cohen misappropriated intellectual property and trade secrets belonging to Schroeder and/or Skoop—will be resolved across the street in the Commercial Division. The litigation before this Court, which appears to have been commenced for the principal purpose of gaining leverage and imposing pain in that action, is at best the undercard to the main event. Having now found for Schroeder in this lightweight exhibition, the Court will allow the parties to retire to their corners to prepare for their next bout before Justice Sherwood. Thus, for the reasons set forth above, Defendant's motion for summary judgment pursuant to Rule 56 is GRANTED.

The Clerk is respectfully directed to terminate the motion pending at docket number 84 and to close this case.

SO ORDERED.