Filed: 2/7/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| JPV I L.P.,<br><br>    Plaintiff and Appellant,<br>v.<br><br>DAN KOETTING et al.,<br><br>    Defendants and Respondents. | A163491<br><br>(Humboldt County<br>Super. Ct. No. CV190030) |

Tribal lending entities Green Gate Services, LLC (Green Gate) and Clear Loan Solutions, LLC (Clear Loan) (collectively the TLEs) prevailed in arbitration and obtained a judgment against Redondo Management, LLC (Redondo), Rockhill Consulting Group, LLC (Rockhill) (collectively the LLCs), and their managing members, Mark Koetting and Daniel Koetting.[1]  In a prior appeal, we reversed the judgment in part as to the Koettings because the TLEs failed to demonstrate that the Koettings clearly and unmistakably consented to the arbitrator's determination of whether they as nonsignatories were bound by the arbitration agreement.  (*Green Gate Services v. Koetting* (Dec. 4, 2020, A158316) [nonpub. opn.] (*Green Gate I*).)

After purchasing the judgment from the TLEs, JPV I L.P. (JPV) moved to amend the judgment to add the Koettings as judgment debtors on an alter ego theory.  On appeal from the denial of that motion, JPV contends the trial

---

[1]    For clarity and brevity, we will use the Koettings' first names when discussing them individually.  No disrespect is intended.

court abused its discretion by: (1) failing to apply the "greatest liberality" standard for amendments to judgments under Code of Civil Procedure section 187 (hereafter section 187); (2) disregarding the collateral estoppel effect of the arbitrator's findings underlying the judgment against the LLCs; and (3) failing to consider all circumstances relevant to the alter ego inquiry, including the arbitral findings that the LLCs wrongfully diverted the TLEs' customers and business opportunities to other entities controlled by the Koettings. We agree with JPV that, with respect to the collateral estoppel and alter ego issues, the trial court made erroneous legal assumptions and misunderstood the proper scope of its discretion. Accordingly, we will vacate the trial court's order and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

We take the following facts from our opinion in the prior appeal and the parties' submissions on the motion to amend.[2]

### A. The Arbitration Proceedings

The TLEs were organized under the laws of the Big Lagoon Rancheria (the tribe), a federally recognized tribe of Yurok and Tolowa Indians. The tribe formed the TLEs to engage in marketing and servicing of small-dollar short-term loans made over the Internet.

In 2013, the TLEs retained the LLCs to manage their online lending programs. Green Gate entered into a Consultant and Independent

---

[2]     Portions of the record and the parties' briefs pertaining to the motion to amend the judgment were filed under seal in this court. (Cal. Rules of Court, rule 8.46(b).) In conformance with the parties' representations at oral argument and in light of the facts already in the public record, this opinion narrowly excludes only certain details claimed as trade secrets. (Cal. Rules of Court, rule 2.550(d); *NBC Subsidiary* (*KNBC-TV*), *Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1222, fn. 46.)

Contractor Agreement with Rockhill, and Clear Loan entered into a substantially identical agreement with Redondo. Daniel signed the agreement with Green Gate in his capacity as president of Rockhill, and Mark signed the agreement with Clear Loan in his capacity as managing partner of Redondo.

Under the agreements, the LLCs were the executive directors of the TLEs and were responsible for running the TLEs' day-to-day operations and managing the lending programs. The TLEs agreed to pay the LLCs a salary and performance fee. Under a compensation schedule attached to the agreements, the TLEs would first receive a specified portion of profits based on a formula before the LLCs received their agreed payments and fees. The agreements each contained a section on " 'Dispute Resolution' " requiring the parties to arbitrate any " 'dispute arising under this Agreement.' "

In 2017, the parties' relationships began to deteriorate, and the LLCs began winding down the loan portfolios. In or around this time, the LLCs and the Koettings (collectively respondents) allegedly implemented a "remarketing program," telling loan customers that the tribe would no longer be making loans and persuading the customers to continue borrowing from new lenders unaffiliated with the tribe. These competing loan portfolios were AvailBlue and Bridge Lending Solutions (BLS). Mark was the managing partner of MRC Consulting, LLC (MRC), which served as the executive director of AvailBlue, while Daniel was a co-owner of GDA Consulting (GDA), which served as the executive director of BLS.

In January 2018, the TLEs terminated the agreements and instructed the LLCs not to make any payments to themselves or third parties of any money derived from the lending partnership, and Green Gate filed a demand

3

for arbitration against Rockhill and Daniel.[3] Rockhill filed a demand for arbitration and counterclaim against Green Gate, and Redondo filed a demand for arbitration against Clear Loan. Clear Loan filed counterclaims against Redondo and Mark.

The TLEs' claims against respondents included breach of contractual and fiduciary duties, fraud, theft, failure to safeguard customer data, payments to themselves following termination, and failure to transfer revenue owed. The TLEs also alleged that the Koettings operated the LLCs as their alter egos. In turn, the LLCs accused the TLEs of breaching the agreements by failing to "enhance compliance" of the lending program, using licensed intellectual property following the termination of the agreements, interfering in the winding down process, and lacking good faith.

After two days of hearing and post-hearing briefing, the arbitrator issued a final award in favor of the TLEs. The arbitrator found in relevant part that respondents breached the covenant of good faith and fair dealing to act for the benefit of the TLEs by remarketing the TLEs' loan customers to unrelated entities controlled by the Koettings and writing off loans belonging to the TLEs so that new business could be generated for the other Koetting entities. The arbitrator also found that the LLCs "violated their duty not to compete with a principal *on his own account . . .* in matters relating to the subject matter of the agency and the duty to deal fairly with the principal in all transactions between them."

As found by the arbitrator, the "customer data, including customer lists and personal identifying information, which was obtained for . . . TLEs by the

---

[3] Green Gate's arbitration demand also named Rivo Holdings, LLC (Rivo), another entity belonging to Daniel that was eventually dismissed from arbitration.

4

LLC Claimants acting as agents for the TLEs in connection with potential or actual loans, remains the property of the TLEs, and the LLC Claimants have no valid claim to that data." "[T]he Tribe contracted with the LLC Claimants to run *its own* Consumer Lending Program, and not to facilitate and grow [the LLCs'] other lending operations." Although "the Agreements were not exclusive, there was no agreement that [the TLEs'] resources and assets could be used to compete with [the TLEs] for the benefit of [the Koettings'] other entities." "The LLC Claimants had no contractual right to divert [the TLEs'] customers or write off loans for their sole benefit, yet the LLC Claimants did so with systematic efforts, including informing [the TLEs'] customers that the relationships they had enjoyed with [the TLEs] would continue with [BLS] and AvailBlue. They are liable to [the TLEs] for damages which arise from their breaches, including the amount of loans they diverted to their own entities." (Fn. omitted.)

The arbitrator also found that the Koettings wrongfully caused the LLCs to continue to pay themselves after the TLEs had terminated the agreements. The arbitrator noted that under the agreements, the LLCs were to be paid only " 'for so long as no properly noticed Event of Default exists,' " and the termination letters that the LLCs received "set forth numerous defaults." Accordingly, the arbitrator found that "[t]o the extent [the Koettings] paid themselves and their affiliated entities after January 8, 2018, they are liable to [the TLEs] for all such payments."

The arbitrator further ruled that the Koettings were jointly and severally liable with the LLCs as their alter egos. The arbitrator found that Daniel had opened a decoy bank account for an entity he created "to divert money from [Green Gate's] account to another account with a virtually identical name controlled by himself," and that Mark routinely used

5

Redondo's bank account to pay personal expenses, as well as credit card expenses for a business partner's wife.

The arbitrator also highlighted Daniel's failure to disclose to the tribe a $5 million loan that Green Gate had entered into with Daniel's other company, Veracity Investment Group (Veracity) in August 2013. The loan agreement contained a limited waiver of tribal sovereign immunity that tribal representative Shawna Neyra testified the tribe would have never approved for a debt of this size. The arbitrator observed that about two months later, Green Gate took out another line of credit for $200,000 from Veracity, and Daniel "could offer no explanation why" Green Gate would need this line of credit when it had millions in other lines of credit available. Although the arbitrator did not award any damages for the LLCs' pretermination conduct, he found that the TLEs' evidence regarding the Veracity lines of credit "illustrate[s] how Dan Koetting operated without regard for the corporate entities he controlled, and without disclosing important information to the Tribe."

Finally, the arbitrator found that "[t]he Koettings' efforts to lead [Green Gate] and [Clear Loan] customers away . . . were not aimed at legitimately winding down [their] portfolios, but were meant to effectuate an improper transfer of valuable assets to entities controlled by the Koettings. . . . The actions of Mark Koetting and Dan Koetting directing and managing the actions of [the LLCs] described above were calculated to maximize their personal benefits, while stripping [Green Gate] and [Clear Loan] of their valuable assets, leaving [the LLCs] valueless, and [Green Gate] [and] [Clear Loan] without a damages remedy." (Fn. omitted.)

The arbitrator awarded total contractual damages of $10,968,794 in favor of Green Gate and against Rockhill and Daniel, and $3,159,443 in favor

of Clear Loan and against Redondo and Mark.[4]  Respondents moved for modification of the final award, arguing that the Koettings were not proper parties to the arbitration and that the trial court, not the arbitrator, must decide whether nonsignatories may be required to arbitrate.  Respondents also challenged the amounts of the final award.  The arbitrator summarily denied the motion.

In January 2019, the TLEs petitioned the trial court to confirm the arbitration award.  As relevant here, the trial court ultimately issued orders granting the petition to confirm the arbitration award and denying a cross-petition to vacate the award.  The court subsequently entered judgment in favor of the TLEs and against respondents.

## B. Prior Appeal

On appeal from the judgment, respondents argued the arbitrator exceeded his authority by finding that the Koettings were subject to arbitration as alter egos, and by awarding damages in excess of a limitation provision in the agreements.  In *Green Gate I*, we rejected the damages argument but agreed that the TLEs failed to show the Koettings clearly and unmistakably consented to have the arbitrator determine the gateway question of whether they, as nonsignatories, were individually bound by the arbitration agreement.  (*Green Gate I*, *supra*, A158316.)  Accordingly, we reversed the judgment in part as to the Koettings but otherwise affirmed the judgment as to the LLCs.  In a footnote, we added that "[w]e express no

---

[4]      The arbitrator stated that the TLEs' additional claims (e.g., breach of fiduciary duty) were, among other things, either "in the alternative" or "would result in the same damages" that were awarded for breach of the Agreements.  Because the arbitrator expressly found that the LLCs violated their duties not to compete with their principals, it is reasonably apparent that the arbitrator viewed its award of contractual damages as fully compensating the TLEs for the LLCs' breaches of fiduciary duty.

7

opinion on the availability of other mechanisms for [the TLEs] to add the Koettings to the judgment as alter egos." (*Ibid.*)

## C. Motion to Amend the Judgment

On remand, the trial court vacated the arbitration award as to the Koettings but confirmed the award as to the LLCs.

Meanwhile, the TLEs assigned the judgment to JPV, and the trial court allowed the action to be continued by JPV as assignee of record. JPV then filed a motion under section 187 to amend the judgment to add the Koettings as judgment debtors under an alter ego theory.

### 1. *Moving Party's Arguments and Evidence*

In its moving brief, JPV argued the Koettings should be added to the judgment as judgment debtors because they controlled the underlying arbitration and were represented in it; they had such a unity of interest and ownership in the LLCs that the separate personalities between the LLCs and the Koettings did not exist; and it would be inequitable to allow the Koettings to escape personal liability.

### a. Daniel Koetting

To demonstrate a unity of interest and ownership between Daniel and Rockhill, JPV submitted evidence that Daniel was Rockhill's president and 50 percent co-owner; that Rockhill used the same address as Daniel's other companies, including Rivo, Veracity, and GDA (which ran the competing BLS portfolio), and that Green Gate directly paid hundreds of thousands of dollars to Daniel even though he had no direct business relationship with Green Gate.

JPV also endeavored to show that Daniel used Rockhill to divert Green Gate's customers to the BLS portfolio by: (1) creating an email template representing that BLS was a continuation of Green Gate and instructing

8

customer services representatives to email Green Gate customers "from [Green Gate's] email w/the esign link for [BLS]"; and (2) having Rockhill's employees waive the balances of Green Gate's customers so that BLS could extend loans to them.

JPV further argued that Daniel engaged in self-dealing by causing Green Gate to take out the $5 million line of credit from Veracity at a high rate of interest (from which Green Gate eventually borrowed $2.9 million). Tribal chairman Virgil Moorehead did not sign this loan agreement, and while he later signed a second line of credit allowing Green Gate to borrow up to $200,000 from Veracity, Daniel was unable to explain why this second line of credit was needed if Green Gate already had the first line of credit in place.

JPV contended that it would be inequitable to allow Daniel to escape personal liability because after Green Gate terminated the agreement, Rockhill used its control of Green Gate's bank account to pay Rockhill, Rivo, and Veracity, but not the tribe, and Daniel withdrew almost $1.5 million from Rockhill's bank account the month after the judgment was entered, leaving Rockhill's bank account empty, while Daniel's other company, GDA, continued to operate the competing BLS portfolio, with no sale of assets from Rockhill to GDA.

### b. Mark Koetting

To demonstrate that Redondo was a shell entity controlled by Mark, JPV submitted evidence that Mark was a 50 percent co-owner and the managing partner of Redondo, and that Redondo's LLC registration in Delaware had been cancelled in July 2015.

JPV offered evidence to show that Mark and Redondo's employees diverted Clear Loan customers to Mark's competing portfolio, AvailBlue, by emailing customers from Redondo email addresses and steering them to

9

AvailBlue. According to JPV, in April 2018, after the tribe terminated the Clear Loan–Redondo agreement, Mark revised Clear Loan's customer privacy policy to allow Clear Loan to share customer information with "non-affiliates," which allowed Mark and Redondo to market AvailBlue loans to "nonactive" Clear Loan customers—i.e., customers whose loans with Clear Loan had been paid or written off. Mark did not ask for the tribe's permission to make this change to the privacy policy, and his only justification was that Redondo owned the data regarding Clear Loan's customers.

JPV also submitted evidence that Mark directed nearly $11 million from Clear Loan to another entity he controlled, Prairie Gate I (Prairie Gate), claiming it was repayment for a $2.8 million loan, effectively giving Prairie Gate a 385 percent return.

JPV argued it would be inequitable to allow Mark to escape personal liability because Redondo had virtually no assets, its bank account was empty, and Mark admitted that his other LLC (MRC) had used Redondo's assets to manage the competing AvailBlue portfolio, with no sale or other transfer of fair value.

### 2. *Opposing Parties' Arguments and Evidence*

In opposition to the motion, the Koettings argued that Delaware law governed the alter ego inquiry because (1) the agreements expressly provided that they "will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the state of Delaware excluding conflict of laws rules"; and (2) Corporations Code section 17708.01, subdivision (a), provides that the law of the state of incorporation governs "[t]he liability of a member as member and a manager as manager for the debts, obligations, or other liabilities of the limited liability company."

10

According to the Koettings, JPV failed to establish under the governing Delaware authorities that the LLCs were sham corporations that existed for no purpose other than as vehicles for fraud.

In his supporting declaration, Daniel stated that Rockhill was adequately capitalized throughout the term of its agreement with Green Gate, had observed corporate formalities throughout its existence, and was not a sham company. According to Daniel, Green Gate's portfolio was successful because of Rockhill's expertise, Rivo's call-center services, and Veracity's access to capital, and tribal chairman Moorehead knew that Daniel co-owned Veracity, having personally signed the $200,000 line of credit with Veracity and "expressly authorized" the other Veracity line of credit for $5 million.[5]

Though the terms of the Green Gate–Rockhill agreement designated Rockhill as the executive director of the loan program with Green Gate, Daniel represented in his declaration that "Green Gate paid *me directly* roughly $300,000 over the four and a half year business relationship for *my* services as Executive Director of the Loan Program." (Italics added.)

Daniel believed Rockhill had no choice but to wind down the Green Gate portfolio in 2017 when the tribe refused to certify Green Gate's compliance with all federal and tribal laws and did not renew Green Gate's annual lending license. Daniel admitted he was "involved in developing" and directing the BLS loan portfolio for a different tribe. He also acknowledged that "some of Green Gate's former customers were offered the opportunity to

---

[5]     In his declaration, Daniel described the $200,000 line of credit as "first" and the $5 million line of credit as "second." However, the undisputed documentary evidence reflected that Green Gate signed the agreement with Veracity for the $5 million line of credit several weeks before it agreed to the $200,000 line of credit.

11

apply for new loans through [BLS]," which he tried to justify by explaining that Green Gate had not told Rockhill what to do with customers during the wind-down process. Daniel also asserted his belief that "Rockhill owned the customer information from the Loan Program."

As for JPV's contention that Daniel emptied Rockhill's bank account of nearly $1.5 million, Daniel explained that in August 2019, approximately $2.6 million was deposited in Rockhill's accounts by captive insurance companies to reimburse Rockhill for amounts that it had paid to settle a class action lawsuit against Rockhill and Green Gate. According to Daniel, two other companies owned, respectively, by himself and his partner Jairo Perez, had advanced the settlement monies "on behalf of Rockhill," and thus, those companies were reimbursed from the insurance proceeds.

Finally, Daniel noted that during negotiations between Rockhill and Green Gate over the agreement, Green Gate did not ask Daniel for a personal guaranty.

Than Thai, Rockhill's accountant/controller and chief financial officer, stated in his supporting declaration that Rockhill observed all corporate formalities, filed tax returns, had bank accounts and financial documentation, was adequately capitalized, had insurance coverage, and paid its members reasonable draws. Thai further stated that "Rockhill did not improperly divert corporate funds or assets" to Daniel, and that Rockhill's payments on Daniel's behalf—such as a $1 million payment to the California Franchise Tax Board—were "booked as a distribution so that [Daniel] was properly taxed."

Perez, Daniel's business partner in Rockhill, Rivo, and GDA, stated in his declaration that he and Daniel formed Rockhill as a single purpose entity to manage the Green Gate portfolio, not "to avoid liability or payment to

12

Green Gate." Perez further stated that in 2015, he and Daniel started a new lending business with the Lac Du Flambeau tribe in Wisconsin, and that Perez and Daniel formed GDA, which entered into a loan management contract with BLS to manage the loan for the Lac Du Flambeau tribe.

Mark submitted a declaration in which he stated he was Redondo's managing member and 50 percent owner and had formed the LLC as a single purpose entity to operate Clear Loan. Mark denied forming Redondo as a façade or to perpetrate fraud, and said he never siphoned funds from Redondo, comingled his funds or any funds of his other entities with Redondo's, or treated Redondo's assets as his own. According to Mark, Redondo "generally" remained in good standing during its existence, and the only time when Redondo's corporate status was "impacted" was when a registered agent was no longer assigned, but this defect was remedied by reinstatement of registered agents. To that end, Mark provided Delaware records showing that Redondo was in good corporate standing as of October 2018 and May 2021. Mark further stated that Redondo observed corporate formalities, including having two members, one manager, a principal place of business, a registered agent and office in Delaware, and separate tax returns and books, and that Redondo had approximately 50 employees, 70 computers, and 75 workstations.

According to Mark, the Clear Loan portfolio was funded by lines of credit from Prairie Gate, an LLC that he formed and managed. The initial line of credit was for $100,000, "which was replaced by a $5 Million loan agreement," and Moorehead knew that Redondo was raising money from outside investors like Prairie Gate. Mark stated that Redondo built the Clear Loan portfolio by relying on algorithms and a database of customer leads that

13

"belonged to Redondo, and was accumulated from prior loan portfolios" that Mark had managed.

Mark further stated that the Clear Loan–Redondo relationship deteriorated when Clear Loan refused to take an active role or renew its licensing, and Clear Loan then "undertook a concerted effort to steal Redondo's proprietary data, underwriting algorithms, software automation processes and trade secrets." According to Mark, once Clear Loan had terminated the agreement in 2018, "it was normal and customary to begin winding down the portfolio," including "the planned disposition of Redondo assets." Finally, Mark noted that Clear Loan did not obtain a personal guaranty from him when negotiating the Clear Loan–Redondo agreement.

Accountant Kim Joseph Onisko submitted a declaration stating that, based on her review of financial information and tax returns, she did not think Mark was Redondo's alter ego or that Redondo was a shell company. Redondo had active business operations, filed tax returns, and had its own set of books, records, and financial statements. She did not see evidence of Redondo commingling funds or disregarding corporate formalities.

### 3. *Reply Arguments and Evidence*

In reply, JPV contended that the law of California, not Delaware, governed the alter ego inquiry on the section 187 motion, and that in any event, the Koettings' alter ego liability was established under either state's law.

JPV further argued that the Koettings "cannot relitigate" the arbitrator's findings that the LLCs had breached the agreements and the covenant of good faith and fair dealing, and that the customer information belonged to the TLEs, not the LLCs.

14

#### 4. *Trial Court's Ruling*

In denying the motion to amend, the trial court first rejected JPV's reliance "on the arbitrator's findings in support of [its] request to add the Koettings as judgment debtors on an alter ego basis." Citing *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 (*Vandenberg*), the court deemed it significant that the arbitrator's findings as to the Koettings' alter ego liability "were vacated when the arbitrator's award was vacated."

Turning to the substantive question of alter ego liability under California law, the trial court cited *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523 (*Sonora*) for the proposition that "[t]he alter ego doctrine is an extreme remedy, sparingly used." While acknowledging the TLEs' evidence on a few of the alter ego factors listed as relevant in the case law, "such as same members, directors or officers, use of same offices and employees, and failure to follow corporate formalities," the court noted the judgment debtors were LLCs that "were not required to hold or observe formalities applicable to regular corporations" because there was no evidence their articles or operating agreement required those formalities.

Next, the trial court found that the declarations of the accountants (Thai, Onisko) "establish[ed] that both LLCs were adequately capitalized when formed and during most of their operating lives; that there was no personal use of LLC assets; to the extent that payments were made by Rockhill LLC on behalf of Dan Koetting, those payments were properly accounted for and recovered; and the LLCs complied with California and Delaware law for LLCs, including maintaining current registration." Additionally, the trial court remarked, the TLEs "could have sought protections in their contracts with the LLCs, such as personal guarantees by the Koettings, but did not do so."

15

The trial court ultimately concluded that "under California law, there was insufficient evidence that use of the LLC form of operating with limited liability was a sham, in bad faith, or intended to defraud [the TLEs]" and that "there is no inequitable result to [the TLEs] by honoring the separate existence of the LLC from its members."  The court expressly found the evidence "insufficient to add Mark Koetting or Dan Koetting as judgment debtors on an alter ego basis or on an equitable basis" and determined the Koettings were "not alter egos under Delaware law (which appears to be more restrictive on alter ego liability than California law)."

JPV timely appealed.

### DISCUSSION

Section 187 provides for "any suitable process" in the exercise of the trial court's jurisdiction, including "an amendment adding a judgment debtor liable for the original defendant's obligations on an alter ego theory." (*Oyakawa v. Gillett* (1992) 8 Cal.App.4th 628, 631.)  "It is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant."  (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 815 (*Relentless*).)  "The decision to grant an amendment lies in the sound discretion of the trial court."  (*Ibid.*)

" 'The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. . . .  In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation[.]' "  (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 510 (*Greenspan*).)  Under both California and Delaware law, the alter ego doctrine extends to LLCs (see Corp. Code, § 17703.04,

16

subd. (b); *NetJets Aviation, Inc. v. LHC Communications, LLC* (2d Cir. 2008) 537 F.3d 168, 178 (*NetJets*)), and generally requires the proponent to demonstrate two elements:  (1) a unity of interest and ownership such that the separate personalities of the corporation and the individual do not exist; and (2) an inequitable result if the corporate identity is not disregarded.  (See *Greenspan*, at p. 511; *NetJets*, at pp. 177–178.)

"Alter ego 'is an extreme remedy, sparingly used.' [Citation.]  ' "The standards for the application of alter ego principles are high, and the imposition of [alter ego] liability . . . is to be exercised reluctantly and cautiously." '  Still, ' "[t]he greatest liberality is to be encouraged" ' in allowing judgments to be amended to add the 'real defendant,' or alter ego of the original judgment debtor, ' "in order to see that justice is done." ' "  (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 281 (*Highland Springs*).)

## A. Greatest Liberality Standard for Amending Judgments

JPV contends the trial court committed legal error by applying "an improperly stringent standard" that alter ego is " 'an extreme remedy, sparingly used' " while failing to recognize that amendments under section 187 are to be allowed with the greatest liberality.  On this score, we find no error by the trial court.

The principle that alter ego is an extreme remedy, sparingly used, originated in *Sonora*, *supra*, 83 Cal.App.4th at page 539, and has often been quoted by the courts of this state.  (See, e.g., *Davidson v. Seterus, Inc.* (2018) 21 Cal.App.5th 283, 306; *Highland Springs*, *supra*, 244 Cal.App.4th at p. 281; *Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1105; *Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 155.)  Other formulations of the same principle urge courts

17

to exercise caution and restraint in disregarding the corporate form. (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 (*Mesler*) ["the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require"]; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249 (*Las Palmas*) ["sound public policy dictates that imposition of alter ego liability be approached with caution"].) Accordingly, the trial court's recitation of the law based on *Sonora* and its progeny was correct.

As for the trial court's failure to expressly acknowledge the greatest liberality standard applicable to section 187 motions, this was apparently due in part to the TLEs' failure to present this argument to the trial court below. No matter. There appears no basis for concluding that this general standard eclipses the caution that courts must exercise in invoking the alter ego doctrine.

Indeed, California appellate courts have expressed no difficulty in balancing, on the one hand, the policy of liberally allowing amendments to judgments, and on the other, the caution and restraint that must be exercised in disregarding the corporate form. (See *Cam-Carson, LLC v. Carson Reclamation Authority* (2022) 82 Cal.App.5th 535, 557 ["while '[a]lter ego is an extreme remedy, sparingly used' [citation], we see no reluctance by California courts to invoke the doctrine where the allegations, if true, would support it"]; *Highland Springs, supra,* 244 Cal.App.4th at p. 281.) As these authorities properly recognize, the greatest liberality standard under section 187 does not remove from consideration the caution and restraint that courts must exercise in deciding whether the alter ego elements have been met. By the same token, where the alter ego proponent sufficiently demonstrates that the elements of the doctrine have been met, courts must exercise their

18

discretion under section 187 with a particular eye towards promoting justice. (§ 187; *Mesler, supra,* 39 Cal.3d at p. 301 [essence of alter ego doctrine is that justice be done].)

Here, the trial court correctly stated the law under *Sonora* and its progeny, while also acknowledging that the alter ego inquiry requires an examination of the equities in deciding whether to disregard the corporate form.

## B. Collateral Estoppel

JPV next contends the trial court erred in failing to give collateral estoppel effect to the arbitrator's findings that the LLCs wrongfully diverted customers from the TLEs to the Koettings' other entities. As we will explain, we agree that the Koettings were not permitted to relitigate the arbitral findings made against the LLCs.

### 1. *Forfeiture*

As a preliminary matter, the Koettings contend JPV forfeited this claim of error by failing to present the issue to the trial court below. We disagree, as the record reflects that JPV squarely argued to the trial court that the Koettings could not relitigate the arbitral findings. Moreover, the court's reliance on *Vandenberg*—a collateral estoppel decision—suggests it understood JPV's argument to invoke the doctrine. That JPV did not specifically discuss the elements of collateral estoppel does not persuade us that JPV failed to present the issue to the trial court with "reasonable clarity" to justify appellate review. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874, 877–878.)

In any case, we have discretion to consider an issue not raised in the trial court to the extent it presents a pure question of law or involves undisputed facts. (See *Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th

19

475, 489–490 [addressing merits of forfeited claim preclusion argument];
*Abatti v. Imperial Irrigation Dist.* (2020) 52 Cal.App.5th 236, 306, fn. 59
[addressing forfeited collateral estoppel argument].)  Here, JPV's collateral
estoppel argument presents a pure question of law (see *Robinson v. U-Haul
Co. of California* (2016) 4 Cal.App.5th 304, 321), and the Koettings do not
contend that this determination involves the resolution of disputed facts.
Accordingly, we will exercise our discretion to consider the issue.

### 2. *Analysis*

"Collateral estoppel precludes relitigation of issues argued and decided
in prior proceedings.  [Citation.]  Traditionally, we have applied the doctrine
only if several threshold requirements are fulfilled.  First, the issue sought to
be precluded from relitigation must be identical to that decided in a former
proceeding.  Second, this issue must have been actually litigated in the
former proceeding.  Third, it must have been necessarily decided in the
former proceeding.  Fourth, the decision in the former proceeding must be
final and on the merits.  Finally, the party against whom preclusion is sought
must be the same as, or in privity with, the party to the former proceeding.
[Citations.]  The party asserting collateral estoppel bears the burden of
establishing these requirements." (*Lucido v. Superior Court* (1990) 51 Cal.3d
335, 341, fn. omitted.)

Here, the issues sought to be precluded from relitigation are identical
to those decided in arbitration.  Specifically, JPV seeks to bind the Koettings
to the arbitral findings that the LLCs did not own the TLEs' customer data
and that the LLCs wrongfully diverted the TLEs' customers to the Koettings'
other entities during the wind-down process.  These issues were actually
litigated and necessarily decided in the former proceeding; indeed, they were
central to the arbitrator's liability findings and damages award.  There is no

20

dispute that the arbitral decision was on the merits or that the award resulted in a final judgment against the LLCs upon confirmation by the trial court. (See Code Civ. Proc., § 1287.4 [confirmed arbitration award has same force and effect of civil judgment].)

In resisting the application of collateral estoppel, the Koettings challenge two of the doctrine's elements. First, they contend collateral estoppel applies only to issues previously determined in a different action, not earlier rulings in the same action, and here, JPV seeks to apply collateral estoppel in the same action in which the arbitration award was confirmed. Second, the Koettings argue that JPV cannot show they were in privity with a party to the arbitration. Both contentions fail.

It is well-settled that an arbitration award may provide the basis for issue preclusion. (*Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1335–1336 [arbitral findings may be given collateral estoppel effect in subsequent lawsuit]; *Lehto v. Underground Constr. Co.* (1977) 69 Cal.App.3d 933, 939 [arbitration award conclusive on matters of fact and law and all matters thereafter are res judicata]; see *In re Khaligh* (Bankr. 9th Cir. 2006) 338 B.R. 817, 826 (*In re Khaligh*) ["California decisional law permits an arbitration award to provide the basis for issue preclusion in the mutual context"].) That the arbitration award here was previously confirmed in the same judicial proceeding in which JPV seeks to apply collateral estoppel does not change the fact that the arbitration involved the actual adjudication of identical issues which resulted in a final judgment on the merits. (See, e.g., *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 758–761 [*unconfirmed* arbitration award was final judgment for res judicata purposes].)

The Koettings' cited authorities are inapposite, as none involved the collateral estoppel effect of a final arbitration judgment in a later

enforcement proceeding under section 187. (See, e.g., *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 770–771 [claim preclusion aspect of res judicata did not bar renewal of motion to compel arbitration after intervening change in law]; *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701–702 [after Supreme Court's unqualified affirmance of judgment, appellate court's reliance on exception to res judicata for intervening changes in law was erroneous because plaintiffs never commenced second litigation]; *Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1185–1186 [order awarding party trial costs was not binding as to party's later application for appellate costs].)

We are likewise unpersuaded by the Koettings' contention that JPV cannot satisfy the privity requirement. "Privity ' "refers 'to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel. [Citations.]' [Citations.] ' "This requirement of identity of parties or privity is a requirement of due process of law." [Citation.] . . .' [Citations.]" ' " (*Mooney v. Caspari* (2006) 138 Cal.App.4th 704, 718.)

After carefully examining the circumstances of this case, we conclude the Koettings and the LLCs had a sufficiently close relationship and identification in interest so as to represent the same legal rights for purposes of the privity concept. There was no dispute that Daniel and Mark each owned 50 percent of their respective LLCs and managed them. The Koettings were directly involved in the arbitration, filing papers through counsel, personally attending the arbitration hearing as the designated

representatives of their respective LLCs, and testifying at the hearing. Because the LLCs' and Koettings' interests were aligned in defending against the claims of the TLEs during the arbitration, the Koettings could reasonably expect to be bound by the findings the arbitrator made against the LLCs.

The Koettings maintain that this court came to a contrary conclusion in *Green Gate I*, but they are mistaken. In *Green Gate I*, we reversed the judgment as to the Koettings solely on the ground that the trial court, rather than the arbitrator, should have decided the gateway question of whether they were personally subject to arbitration. Our privity ruling today is that the Koettings, by way of their relationship to the LLCs, could reasonably expect to be precluded from relitigating the arbitral findings *regarding the LLCs*.[6]

Citing *Vandenberg*, the Koettings argue that applying the collateral estoppel doctrine here would be unfair and contrary to public policy because the Koettings did not expressly agree to be bound by the arbitrator's findings. We are not persuaded. In *Vandenberg*, the Supreme Court held that a private arbitration award, even if judicially confirmed, can have no collateral estoppel effect in favor of "*nonparties* in litigation involving *different* causes of action" unless the arbitral parties agreed that such a consequence should apply. (*Vandenberg, supra*, 21 Cal.4th at p. 831.) *Vandenberg* emphasized that its holding was "narrowly circumscribed" to the context of nonmutual collateral estoppel, and that it was not addressing "the circumstances, if any, in which a private arbitration award may have 'issue preclusive' effect in

---

[6] To be clear, the partial reversal on appeal and vacating of the judgment as to the Koettings means that the arbitrator's specific *alter ego* findings against the Koettings, too, were vacated. But this does not mean the arbitral findings *as to the LLCs* could be ignored as irrelevant to the alter ego inquiry on the section 187 motion.

23

subsequent litigation between the *same parties* on different causes of action." (*Id.* at p. 824, fn. 2.) In the instant case, the estoppel is not nonmutual, but instead mutual, as the Koettings are in privity with their respective LLCs. (*In re Khaligh, supra,* 338 B.R. at p. 826 [mutual means "between the same parties and those in privity with them"].)[7]

Because the arbitral findings regarding the LLCs' wrongful conduct were entitled to collateral estoppel effect, the Koettings could not relitigate these findings on the section 187 motion.

**C. Alter Ego Amendments**

We now turn to JPV's main contention that the trial court erred in its application of California alter ego law to the facts by failing to consider all circumstances relevant to the alter ego inquiry, including the arbitral findings that the LLCs wrongfully diverted the TLEs' customers to the Koettings' other entities.

"In order to prevail in a motion to add judgment debtors, [the judgment creditor] must show that (1) the parties to be added as judgment debtors had control of the underlying litigation and were virtually represented in that proceeding; (2) there is such a unity of interest and ownership that the separate personalities of the entity and the owners no longer exist; and (3) an inequitable result will follow if the acts are treated as those of the entity alone." (*Relentless, supra,* 222 Cal.App.4th at pp. 815–816.)

**1. *Control of Underlying Litigation and Representation***

There is no dispute that the Koettings had control of the arbitration and were represented in it, as they personally attended the arbitration

---

[7] While JPV was not a party to the arbitration, as the assignee of the judgment, JPV stands in the shoes of the TLEs for purposes of our analysis. (See *Cal-Western Business Services, Inc. v. Corning Capital Group* (2013) 221 Cal.App.4th 304, 311.)

24

proceedings, submitted sworn declarations, testified, and were represented by counsel at all times.

### 2. *Unity of Interest and Ownership*

Among the many factors relevant in applying the alter ego doctrine are "one individual's ownership of all stock in a corporation; use of the same office or business location; commingling of funds and other assets of the individual and the corporation; an individual holding out that he is personally liable for debts of the corporation; identical directors and officers; failure to maintain minutes or adequate corporate records; disregard of corporate formalities; absence of corporate assets and inadequate capitalization; and the use of a corporation as a mere shell, instrumentality or conduit for the business of an individual." (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073 (*Misik*).) Other recognized factors include "the use of the corporate entity to procure labor, services or merchandise for another person or entity" and "the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors." (*Greenspan*, *supra*, 191 Cal.App.4th at p. 513.)

Critically, " ' "[n]o single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." ' " (*Greenspan, supra,* 191 Cal.App.4th at p. 513.) "There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." (*Mesler*, *supra*, 39 Cal.3d at p. 300.) "Because it is founded on equitable principles, application of the alter ego 'is not made to depend upon prior decisions involving factual situations which appear to be similar. . . . "It is the general rule that the conditions under which a corporate entity may be disregarded

25

vary according to the circumstances of each case." ' " (*Las Palmas*, *supra*, 235 Cal.App.3d at p. 1248.)

Furthermore, the alter ego inquiry may, in appropriate circumstances, focus narrowly on certain inequitable uses of the corporate form for specific purposes. In *Kohn v. Kohn* (1950) 95 Cal.App.2d 708 (*Kohn*), the court held in a marital dissolution case that the husband's corporation was his alter ego for purposes of including its income in the determination of the husband's liability, as the husband had admitted that one of the purposes of the formation of the corporation and transfer of properties to it was to minimize his alimony payments. (*Kohn*, at p. 719.) As the court explained, "The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether *in the particular case presented and for the purposes of such case* justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." (*Id.* at p. 718, italics added.) *Kohn* acknowledged "there may well have been various business reasons sufficient to justify and support the formation or continuation of the corporation on the part of defendant. For such purposes the [corporation] still stands." (*Id.* at p. 719.) Similarly, the California Supreme Court has analogized the imposition of alter ego liability as "a hole" being "drilled in the wall of limited liability erected by the corporate form; for all purposes other than that for which the hole was drilled, the wall still stands." (*Mesler*, *supra*, 39 Cal.3d at p. 301.)

With these principles in mind, we turn to JPV's contention that the trial court erred in its application of the law. The trial court's order reflects it made the following findings in denying the alter ego amendment: the LLCs'

failure to observe corporate formalities "for meetings" was inconsequential because there was no evidence that the LLCs' articles or operating agreements required such formalities; the declarations of accountants Thai and Onisko established that the LLCs were adequately capitalized and complied with the law for LLCs, "including maintaining current registration"; and "there was no personal use of LLC assets." The court also observed that the TLEs failed to obtain personal guarantees by the Koettings.

Based on this statement of findings, JPV contends it is clear that the court did not consider " ' "all the circumstances" ' " relevant to the alter ego inquiry (*Greenspan*, *supra*, 191 Cal.App.4th at p. 513), including the arbitral findings regarding the LLCs that were entitled to collateral estoppel effect. JPV also highlights a portion of the order where the court stated it would "not consider the arbitrator's findings as to the Koettings' alter ego liability" and contends the statement is ambiguous as to whether the court disregarded only the arbitrator's specific alter ego findings against the Koettings, or whether it refused to consider *any* of the arbitrator's findings in ruling on the section 187 motion. JPV maintains the latter interpretation is more likely given that the remainder of the court's order did not address or even mention any of the arbitrator's findings.

The Koettings respond that the trial court's order is not ambiguous at all, as the court made clear it was disregarding only the arbitrator's alter ego findings, and properly so, in light of the partially vacated judgment. The Koettings further argue that under the presumption of correctness applied by reviewing courts, JPV's mere speculation that the court failed to consider all relevant circumstances is insufficient to support reversal on appeal.

The presumption of correctness is a fundamental rule of appellate procedure under which a reviewing court must indulge all intendments and

27

presumptions that support the trial court's order.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  "In reviewing any order or judgment we start with the presumption that the judgment or order is correct, and if the record is silent we indulge all reasonable inferences in support of the judgment or order.  [Citation.]  Nonetheless, ' "all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citations.]  Therefore, a discretionary decision may be reversed if improper criteria were applied or incorrect legal assumptions were made.  [Citation.]  Alternatively stated, if a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law.' " (*Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289, 299 (*Chalmers*).)

Consistent with these principles, we will assume the trial court considered all circumstances relevant to the alter ego inquiry that were presented by the parties on the section 187 motion.  However, for the reasons discussed below, we conclude that JPV's remaining arguments have merit and sufficiently undermine our confidence that the trial court's ultimate decision reflected a legally correct exercise of its discretion.

### a. Maintaining Current Registration

The trial court found that Redondo "complied with California and Delaware law for LLCs, including maintaining current registration."  As JPV points out, however, the evidence was *undisputed* that Redondo failed to maintain valid registration in Delaware from July 2015 through September 2018 due to its lack of a registered agent.  (See 6 Del. Code, § 18–104, subd. (b) [each LLC must have registered agent listed with Secretary of State].)  Mark's evidence did not demonstrate otherwise.  Onikso merely

28

observed certificates of good standing for Redondo as of October 6, 2018, and May 5, 2021, while Mark stated in his declaration that Redondo has "generally" remained in good standing, pointing to those same two certificates. Accordingly, it was uncontested that Redondo did not maintain valid registration in Delaware for most of its relationship with Clear Loan, including during the critical wind-down period when the misconduct at issue occurred. It was only after the arbitration proceedings had commenced that Redondo took steps to cure its registration status. To the extent the trial court found that Redondo maintained current registration at all relevant times, that finding was unsupported by substantial evidence.

Alternatively, to the extent the trial court believed it was sufficient for alter ego purposes that Redondo had current registration as of the time of the section 187 motion, this finding rested on a legally erroneous assumption. As discussed, the alter ego inquiry focuses on whether the corporate form was inequitably used under the particular circumstances of a given case, not simply whether the corporation maintained good standing for all purposes. (See *Kohn*, *supra*, 95 Cal.App.2d at p. 718.) Thus, the pertinent question is whether Redondo's cancelled registration status during the wind-down period supported JPV's position that Mark used the LLC as an instrumentality to procure services for another person or entity and to enrich himself. (See *Greenspan*, *supra*, 191 Cal.App.4th at p. 513; *Misik*, *supra*, 197 Cal.App.4th at p. 1073.)

For these reasons, we conclude that substantial evidence did not support the trial court's finding that Redondo "complied with California and Delaware law for LLCs, including maintaining current registration."

29

### b. No Personal Use of LLC Assets

The trial court also found there was "no personal use of LLC assets." Read in context, this statement is best understood as referring to withdrawals from the LLCs' bank accounts, given that the court attributed this finding to the accountants' declarations. But to the extent this statement encompassed a broader finding that the Koettings did not personally use *any* of the LLCs' assets, including the LLCs' email addresses and access to the TLEs' customers, that finding would be unsupported by substantial evidence and would conflict with the binding arbitral finding that the LLCs engaged in wrongful diversions of the TLEs' customers and business opportunities to the Koettings' other entities.

Starting from the premise that the trial court found Rockhill was adequately capitalized and in compliance with California and Delaware law for LLCs, Daniel argues there was no evidence compelling the trial court to find that he, rather than the corporate entities themselves, "controlled the decisions made when winding down Green Gate's loan program." However, it does not follow from Rockhill's capitalization and good corporate standing that Daniel had no personal involvement in the redirection of Green Gate customers to his other entities during the wind-down period. There was no dispute that Daniel fulfilled Rockhill's role as executive director of Green Gate, and Daniel's own declaration reflected his direct involvement in the management of the Green Gate loan program. At the very least, Green Gate's payment of a salary "directly" to Daniel (even though the contract was with Rockhill), and Daniel's use of the Rockhill address for his other companies, appear inconsistent with a finding that there was " '*no* personal use' " of Rockhill's assets by Daniel.

Mark likewise contends there was no evidence that he or Redondo targeted Clear Loan customers and encouraged them to borrow from AvailBlue. But Mark's supporting evidence tended to establish only that he did not believe certain draft templates of a marketing email were sent to Clear Loan customers. As JPV points out, Mark otherwise testified that when Clear Loan customers called Redondo asking for a new loan, "we" would direct them to AvailBlue. Mark also admitted that he unilaterally changed Clear Loan's privacy policy to allow his other company, MRC, to market AvailBlue loans to Clear Loan customers. In other words, the evidence was undisputed that Mark was involved in some manner in Redondo's marketing of AvailBlue to Clear Loan customers and was directly involved in the change to the privacy policy that facilitated it.[8]

For these reasons, we conclude the evidence on the section 187 motion, combined with the binding arbitral findings regarding the LLCs, simply did not support a finding of " '*no* personal use of LLC assets' " by the Koettings.

### c. Sham, Bad Faith, or Intent to Defraud

In concluding that JPV failed to prove the Koettings' alter ego liability, the trial court found that "under California law, there was insufficient evidence that the use of the LLC form of operating with limited liability was

---

[8]     The Koettings also attempted to relitigate the issue of ownership of the customer data by maintaining that the information belonged to the LLCs. But the arbitrator already found that the customer data belonged to the TLEs. In any event, even assuming the LLCs owned the customer information, using that information to redirect the TLEs' customers to the Koettings' competing loan portfolios appears inconsistent with the LLCs' roles as single purpose entities created to operate the TLEs' loan programs, and there was no evidence that the Koettings or their other entities paid the LLCs for these customer leads.

a sham, in bad faith, or intended to defraud [the TLEs]." This formulation of the law was in error.

California law does not limit alter ego liability to circumstances in which the corporate entity was a sham, was operated in bad faith, or was created with the intent to defraud. Rather, courts may ignore the corporate entity under the alter ego doctrine "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish *some other wrongful or inequitable purpose*." (*Sonora, supra*, 83 Cal.App.4th at p. 538, italics added.)

*Turman v. Superior Court* (2017) 17 Cal.App.5th 969 is instructive. There, the trial court had found no alter ego liability based on its observations that the corporate entity " 'was a real business with real purpose and assets and not a sham corporate entity *formed for* the purpose of committing a fraud or other misdeeds.' " (*Id.* at p. 981.) The appellate court held that this narrow formulation of the doctrine based on the purposes of the corporate entity's formation "suggest[ed] a misunderstanding of the applicable law." (*Ibid.*) Accordingly, *Turman* reversed and remanded the matter with directions to the trial court to "to make findings on alter ego liability according to the requirements set forth in *Sonora*." (*Ibid.*)

Likewise, by suggesting that California law required JPV to show that the LLCs were a sham, in bad faith, or intended to defraud, the trial court evidently viewed the applicable law too narrowly. Taken together with the other errors identified above, we are persuaded that the trial court misunderstood the proper scope of its discretion in its application of the alter ego doctrine, and that this constituted an abuse of discretion. (See *Conservatorship of Bower* (2016) 247 Cal.App.4th 495, 506 (*Bower*); *Horsford*

*v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 (*Horsford*).)[9]

### 3. *Inequitable Result*

Application of the alter ego doctrine also requires "a finding that the facts are such that adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice. [Citation.] The test for this requirement is that if the acts are treated as those of the corporation alone, it will produce an unjust or inequitable result." (*Misik, supra,* 197 Cal.App.4th at p. 1073.) "An inequitable result does not require a wrongful intent." (*Relentless, supra,* 222 Cal.App.4th at p. 813.)

We agree with the Koettings that difficulty in enforcing a judgment or collecting a debt does not, by itself, constitute an inequitable result for purposes of the alter ego doctrine. (*Sonora, supra,* 83 Cal.App.4th at p. 539.) However, JPV did not rely solely on its inability to collect on the judgment. Instead, JPV offered evidence that the LLCs were single purpose entities entrusted with managing the TLEs' day-to-day operations but were used to benefit the Koettings and their other businesses by diverting the TLEs' customers and business opportunities to those entities and borrowing money from the Koettings' other entities at high interest rates. There was also evidence that the LLCs' bank accounts were emptied—including a $1.45

---

[9] JPV also contends the trial court erred in failing to consider the evidence that the Koettings engaged in self-dealing by causing the LLCs to enter into loans with the Koettings' other entities at exorbitant interest rates. As explained, we must assume the trial court considered these circumstances because they were presented in the papers below. (*Chalmers, supra,* 213 Cal.App.4th at p. 299.) However, in light of our other conclusions and our clarification of the legal standards for alter ego liability, the circumstances regarding the Veracity and Prairie Gate lines of credit may take on a new light. We leave that reassessment for the trial court on remand.

33

million withdrawal from Rockhill's accounts to another one of Daniel's companies a month after the judgment was entered— leaving JPV unable to collect on the sizeable damages award.  In other words, JPV's inability to collect, when combined with the other factors indicating inequitable uses of the corporate form, may satisfy the unjust result element for alter ego liability.  (See *Butler America, LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal.App.5th 136, 147 ["it would be an inequitable result to preclude Butler from collecting its judgment by treating AFS as a separate entity"]; *Relentless*, *supra*, 222 Cal.App.4th at p. 813 ["Relentless cannot collect its judgment because Airborne is insolvent.  Under the circumstances here, this is an inequitable result as a matter of law"].)  In light of our previous conclusion that the trial court erred in analyzing the unity-of-interest element, a reexamination of this alter ego element is warranted as well.

Moreover, the trial court's decision appears to have been influenced by the Koettings' legal argument that courts are less likely to find an inequitable result for alter ego purposes in breach of contract cases.  Indeed, the court endorsed this argument when it found that the TLEs "could have sought protections in their contracts with the LLCs, such as personal guarantees by the Koettings, but did not do so."  JPV argues, and we agree, that adopting the Koettings' argument was legal error.

The Koettings relied for their position on various out-of-state authorities, most notably *Cascade Energy & Metals Corp. v. Banks* (10th Cir. 1990) 896 F.2d 1557, 1576–1578 (*Cascade Energy*), where the United States Court of Appeals for the Tenth Circuit held that "Utah courts, like courts generally, appear less likely to pierce a corporate veil when a consensual, contract-like transaction is involved than when a nonconsensual, tort-like transaction is involved."  But the only reported California decisions to cite

34

*Cascade Energy* did so merely to state general principles of limited liability through incorporation. (See *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.* (1993) 19 Cal.App.4th 615, 628; *Las Palmas*, *supra*, 235 Cal.App.3d at p. 1249.) As far as we are aware, no California court has endorsed *Cascade Energy*'s higher threshold for satisfying the inequitable result element whenever a contract is involved. This includes *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, which, contrary to the Koettings' assertions, is not only distinguishable on its facts but did not articulate or otherwise endorse a general rule that courts are less likely to find injustice in breach of contract cases.

Furthermore, and in any event, the instant matter was not merely a breach of contract case. The TLEs also asserted tort claims, including theft and breach of fiduciary duty, and the arbitrator specifically found that the LLCs violated their duties to deal fairly and to not compete with their principals. (See *Seibold v. Camulos Partners LP* (Del. Ch. 2012) 2012 Del. Ch. Lexis 216, p. *82 [holding it is a breach of fiduciary duty for agent to use principal's resources to compete with principal].) Thus, while the *Cascade Energy* rule is premised on the ability to protect oneself in a consensual, arms-length transaction, the instant matter presents a case where the alleged misconduct went beyond the bargained-for terms of the agreements and involved the use of LLCs in a manner wholly inconsistent with their single purpose. Assuming the unity-of-interest element of the alter ego doctrine is met, applying the *Cascade Energy* rule on these facts would itself lead to an inequitable result. (See *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 992–993 [rejecting rule in fraud cases that parties are limited to contract damages, as parties to contract " 'cannot

35

rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract' "].)

In sum, we conclude the trial court misunderstood and misapplied the proper scope of its discretion in evaluating the inequitable result element of the alter ego doctrine, which constituted an abuse of discretion. (See *Bower, supra*, 247 Cal.App.4th at p. 506; *Horsford, supra*, 132 Cal.App.4th at p. 393.)

## D. Delaware Law

The Koettings contend that regardless of whether the trial court properly applied California law, the law of Delaware governs the alter ego question and compels the conclusion that the Koettings were not personally liable. JPV maintains that California law applies because the amendment of a judgment is a procedural matter, and procedural matters are generally governed by the law of the forum state. We need not resolve this choice-of-law dispute because there is no indication that the application of Delaware alter ego law would lead to a different result.

Citing *Wallace ex rel. Cencom v. Wood* (Del. Ch. 1999) 752 A.2d 1175 (*Wallace*), the Koettings insist that under Delaware law, alter ego liability may be found only where the corporate entity is a sham and exists "for no other purpose than as a vehicle for fraud." In their view, JPV's evidentiary showing did not come close to demonstrating that the LLCs existed "for no other purpose than as a vehicle for fraud," as the LLCs were legitimate entities that successfully serviced the TLEs' loan programs for many years.

Contrary to the Koettings' assertions, courts applying Delaware law have used different formulations of the alter ego standard that reflect a more flexible approach to the doctrine. For instance, the Delaware Supreme Court has held that the corporate form may be disregarded "only in the interest of justice, when such matters as fraud, contravention of law or contract, public

36

wrong, or where equitable consideration among members of the corporation" are involved. (*Pauley Petroleum Inc. v. Continental Oil Company* (Del. 1968) 239 A.2d 629, 633.) More recently, the Delaware high court explained that under the state's alter ego doctrine, the corporate form may be disregarded " 'when a corporation is the mere instrumentality or business conduit of another corporation or person.' " (*West Coast Opportunity v. Credit Suisse* (2010) 12 A.3d 1128, 1132, fn. 6; see also *Geyer v. Ingersoll Publications Co.* (Del. Ch. 1992) 621 A.2d 784, 793.)

And in *NetJets*, a federal appeals court applying Delaware law explained that " '[n]umerous factors come into play when discussing whether separate legal entities should be regarded as alter egos,' [citation], and '[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over- nor under-inclusive,' [citation]." (*NetJets*, *supra*, 537 F.3d at p. 177.) Thus, a party seeking to pierce the corporate veil "need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used." (*Ibid.*, citing *Martin v. D. B. Martin Co.* (Del. 1913) 88 A. 612, 615.)

These authorities leave ample room for a theory of alter ego liability based on injustices "similar" to fraud (*Wallace*, *supra*, 752 A.2d at p. 1184)[10] due to the specific ways in which the corporate form is used (*NetJets*, *supra*, 537 F.3d at p. 177). Accordingly, even if the Koettings' contractual and statutory choice-of-law arguments are correct, they fail to demonstrate that JPV's theory of alter ego liability would be foreclosed under Delaware law.

---

[10] In *Wallace*, the plaintiffs merely alleged that a general partner managed and operated a limited partnership, which the court found was simply too conclusory to justify disregarding the corporate form of the general partner. (*Wallace*, *supra*, 752 A.2d at p. 1184.) The situation here is plainly distinguishable.

Based on the foregoing, we conclude the trial court's order denying the section 187 motion must be reversed.  We remand the matter for a fresh consideration of the motion so that the court may exercise informed discretion with awareness of the full scope of its discretion and the applicable law.  (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 26.)

## DISPOSITION

The order is reversed, and the matter is remanded with directions to the trial court to vacate the order denying the motion to amend the judgment and to conduct further proceedings on JPV's motion to amend the judgment consistent with this opinion.  JPV is awarded its costs on appeal.


FUJISAKI, ACTING P.J.


WE CONCUR:


PETROU, J.


RODRÍGUEZ, J.


*JPV I. L.P. v. Koetting* (A163491

Trial Court:      Humboldt County Superior Court

Trial Judge:      Hon. Timothy Canning

Counsel:      Janssen Malloy, William H. Stein; Greines, Martin, Stein & Richland, Cynthia E. Tobisman, and Alana H. Rotter for Plaintiff and Appellant

Horvitz & Levy, John A. Taylor, Jr., John F. Querio; and Aldisert Law, Gregory J. Aldisert for Defendant and Respondent Dan Koetting

The Vanderpool Law Firm, Douglas B. Vanderpool, and Michael J. Fairchild; The Mitchell Law Firm, Nancy Delaney for Defendant and Respondent Mark Koetting